BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

MARCH TERM, 1918.

---

L. H. COCHRANE et al., Appellants, v. FIRST STATE BANK OF PICKTON, TEXAS, Interpleader, Respondent; CHARLES WARD et al., Garnishees, Appellants.

### Kansas City Court of Appeals, March 4, 1918.

1. **JURY: Directed Verdict: Burden of Proof: Instructions.** Where one interpleads in an attachment suit, he assumes the position of plaintiff and the burden of proof rests upon him and where the testimony offered in support of the interplea is oral the credibility of the witnesses is for the jury and the court is without power to direct a verdict.

2. **BILLS OF LADING: Transfer of Property Shipped: Intention of Parties.** Bills of lading to shipper's order delivered to a bank puts the legal title to the property shipped in the bank, but where this is done, not to effect a sale of such property but merely to afford security, then the legal title does not pass to the bank. Whether there was a sale to the bank depends upon the intention of the parties.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner, Judge.*

REVERSED AND REMANDED.

*Hal R. Lebrecht* for appellants.

*Sherman & Landon* for respondents.

619

TRIMBLE, J.—On the 17th and 18th days of July, 1916, J. C. Walters of Pickton, Texas, shipped to Kansas City, Missouri, three carloads of peaches on bills of lading to shipper's order with instructions to notify Ward Brothers. He drew two drafts on Ward Brothers at Kansas City, one for $322.10 to which he attached the bill of lading issued on one car, and the other for $539.10, to which he attached the bills of lading issued upon the other two cars. These drafts were not made payable to Walter's order but were payable to the First State Bank of Pickton, Texas.

On the 18th and 19th days of July, 1916, Ward Brothers telegraphed the bank guaranteeing 75 cents per bushel on one car shipped by Walters and 85 cents per bushel on the other two. After receiving these telegrams, the Bank received from Walters the said drafts, aggregating $861.20, with the bills of lading thereto, attached, and deposited to Walters' credit on his checking account the amount of said drafts, less $2.15 exchange. The Bank then sent the drafts to its proper correspondents to be sent to Kansas City for payment by Ward Brothers.

One of said cars arrived in Kansas City on July 20th and the other two on the 21st, but, as the bills of lading with drafts attached had not come, Ward Brothers requested Walters to have the railroad telegraph a release of the cars without payment of said drafts. Walters thereupon signed an order directed to the station agent at Pickton to release said cars without taking up the bills of lading, thus allowing the shipments to be delivered to Ward Brothers without payment of the drafts. The agent before wiring the release took the order, thus signed by Walters, to the Bank and the cashier wrote the Bank's name above that of Walters with the word "By" in front of his name. Thereupon, the agent sent to Ward Brothers the desired release and Ward Brothers obtained possession of the cars without a surrender of the bills of lading or payment of the drafts. Ward Brothers then sold the peaches, received the proceeds thereof and had said proceeds in their possession.

On July 31, 1916, the plaintiff brought suit by attachment in Jackson county, Missouri, against Walters, and on the same day garnished Ward Brothers, the writ directing them to appear at the September term, 1916, and answer interrogatories. When the drafts arrived in Kansas City and were presented to Ward Brothers some time in August, payment on them was refused and they were returned to the Pickton Bank.

On the return day of the writ, Ward Brothers, the garnishees, answered saying Walters had shipped them the three cars of fruit and that the amount due on said cars was $520.62; that garnishees owed said amount, except $123.75, which Walters owed them, leaving a net amount of $396.87 owing by the garnishees to the shipper. The answer then stated that garnishees had been informed that the First State Bank of Pickton, Texas, claimed said amount and that garnishees were unable to state whether said sum of $396.87 was owing by them to defendant Walters or should go to the plaintiff, and garnishees asked the court to direct them to whom to pay said sum, and to allow garnishees a reasonable amount for answer fee. No denial of this answer was filed by the plaintiffs or anyone else.

On the 20th of September, 1916, the Bank filed its interplea claiming that after the shipment, but before the cars were delivered to Ward Brothers and prior to the garnishment, the fruit contained in said cars was sold and delivered to the Bank, for which it had paid full value, and it thereupon became the owner thereof; and that the money garnished in the hands of Ward Brothers was not the property of Walters nor did he have any interest therein.

Plaintiffs' answer to the interplea was a general denial.

A trial of the issues made on the interplea was had before a jury, and at the close of all the evidence the interpleader Bank asked, and the court gave, a peremptory instruction to return a verdict in the interpleader's favor. This was done, and thereupon the court rendered judgment directing the garnishees to pay the sum of

$520.62 to the interpleaders. Whereupon the plaintiffs and the garnishees separately perfected their respective appeals, but afterwards the two appeals were by stipulation consolidated.

The original proceeding in this case is the attachment suit, and the interplea by the Bank is another and independent action engrafted thereon, the purpose of which was to recover, as in replevin, the property attached. Hence, on the trial of the interplea, the interpleader assumed the position of plaintiff and had the burden of proof. [Torreyson v. Turnbaugh, 105 Mo. App. 439; Keet-Roundtree Dry Goods Co. v. Hodges, 175 Mo. App. 484.] This was recognized in the trial as the interpleader was accorded the opening and closing. Plaintiffs, therefore, complain of the action of the court in granting a peremptory instruction to find for interpleader urging that the latter had the burden of proof and the testimony in support of its case was oral and not conclusive upon plaintiffs; in which situation the credibilty of the witnesses was for the jury. It is well settled that in such circumstances the court is without power to direct a verdict. [Fehrenbach Wine & Liquor Co. v. Atchison, Topeka and Santa Fe Ry. Co., 180 Mo. App. 1, 10; Warren v. New York Life Ins. Co., 182 S. W. 96.] So that if the circumstances of the case are such as to bring it within the rule, it calls for a reversal and remanding of the cause upon this point alone.

Considering whether the case comes within the above rule, it will be observed that the question at issue in the trial of the interplea was: Who was the owner of the peaches (and consequently entitled to their proceeds) at the time of their delivery to Ward Brothers? The theory of the Interpleader Bank is that when Walters delivered the drafts and the bills of lading to the Bank and received credit for the amount thereof as a deposit in his account, this was *a sale of the peaches to the Bank* and, therefore, at the time the peaches were received by Ward Brothers, the Bank, and not Walters, owned them and was entitled to their proceeds; hence the proceeds were not subject to

plaintiffs' attachment as the property of Walters. On the other hand, plaintiffs' theory was, and is, that the transaction between Walters and the Bank was not a sale of the peaches themselves but a mere deposit of the amount represented by the drafts, the Bank receiving the drafts, in exchange leaving Walters still the owner of the proceeds subject to the garnishment of his attaching creditor.

It is disclosed by the evidence of Interpleader's cashier, its witness, that when the drafts were returned, the Bank charged the amount thereof back to Walters' account and that at that time there was enough and more than enough funds on deposit to Walters' credit to reimburse the Bank, but that after the drafts had thus been taken out of Walters' deposit account he learned of it and protested against it, but agreed to let matters stand thus "temporarily" on condition that the Bank let him go ahead checking on his account the same as if the amount of the drafts was on deposit to his credit. This the Bank permitted until some time in November, 1916, when it replaced the amount of said drafts to Walters' credit in his deposit account; that during the larger portion of the time between the charging back of the drafts and the recrediting of said account with the amount thereof Walters' account had more than sufficient funds to take care of said drafts. This charging back of the drafts to Walters' account at a time when there were plenty of funds therein to cover them is a circumstance not in the case of Hass v. Kings County Fruit Co., 183 S. W. 676, and Jefferson Bank v. Merchants Refrigerating Co., 236 Mo. 407, 415, upon which interpleader relies. And it is for this reason that plaintiffs say those cases are not in point.

But interpleader insists that Walters checked out the exact amount of the drafts on the day the Bank took them, and that when the drafts were returned unpaid and were by the Bank taken out of Walters' deposit account, Walters did not agree to it, but protested, and the Bank, acceding to Walters' protests, made an agreement to let matters stand temporarily

as they were, with Walters having the privilege of checking on the account as though the amount of the drafts were still to his credit, and that the Bank did finally replace said amount in his deposit account. It would seem that if the Bank took the amount of the drafts out of the deposit account when they returned unpaid, it thereby was repaid the amount it had given for the drafts and it could not thereafter, with notice of plaintiffs' attachment, return the money to Walters' account and look to the proceeds of the peaches. But interpleader says that Walters did not agree to the drafts being charged back to him, and therefore, the Bank's attempt to do so was abortive so that the Bank had to replace the money in Walters' account and look solely to the proceeds. The trouble with this contention (if the transaction between Walters and the Bank, with reference to the drafts and bills of lading, was a mere exchange of a credit of deposit for the drafts with the bills of lading *as security*), is that the Bank had the right to thus charge the drafts back to Walters' account whether he agreed to it or not. The general rule is that a bank may apply the debtor's deposits on his debts to the bank as they become due, and while it is sometimes said that a bank has a lien on the deposits for this purpose, the more accurate statement is this, that the right of the bank is not really in the nature of a lien, but is rather a right of setoff or application of payments, and the exercise of the right is *optional* with the bank. [7 Corpus Juris., Sec. 351, pp. 653-4-5; Muench v. Valley National Bank, 11 Mo. App. 144.] It would seem, therefore, that if the Bank merely exchanged a deposit credit for the drafts and took the bills of lading *as security*, then its recharging of the drafts against the depositor's account at a time when there was sufficient funds to take care of the drafts, was a recovery of the money it had paid for them. The fact that this was without Walters' consent made no difference, since the Bank had the legal right to do this. And under these circumstances, the fact that thereafter the Bank, with knowledge of plaintiffs' attach-

ment, acceded to Walters' demands and replaced the
money to his credit, would be a matter of the bank's
own lookout and not a matter which the Bank could
rely upon in an effort to defeat plaintiffs' attachment
lien.    The fact that the drafts were made payable
direct to the Bank and were not endorsed by Walters to
the Bank makes no difference since the deposit credit
was given in exchange for the drafts and the exchange
was made subject to the condition that the drafts be
fully paid.    The deposit slip issued by the Bank for
this deposit had on it "all checks and drafts credited
subject to full payment." Besides, the drawer of the
draft, which was returned dishonored, would be pri-
marily liable for the amount of money he had obtained
thereon.

What has been said in the foregoing is on the
theory that the original transaction between the Bank
and Walters was over the drafts with the bills of lading
merely *as security* therefor.    But if the transaction
between them was *a sale of the peaches* to the Bank,
then doubtless the Bank could not go back upon its
purchase and take its money back without Walters'
consent.

Now, it is undoubtedly true that by the delivery
to the bank of the bills of lading to shipper's order, the
*legal title* to the peaches was put in the bank; but this
may have been done, not to effect a sale of the peaches
to the bank but merely to afford it security, just as
the legal title to property is put in another by way of
mortgage, so that whether the transaction was a sale
of the peaches to the bank or was merely a transfer
of the legal title as security, would depend upon the
intention of the parties to be determined in the light
of all the circumstances and their conduct in the
premises.    Now, the evidence is in such shape that
different inferences might be drawn from the trans-
action.    In one view of the evidence it might be taken
to mean that Walters contracted for a sale of the
peaches to Ward Brothers but before delivery he sold
the peaches to the Bank and that at the time they

were delivered to Ward Brothers the Bank was the owner thereof and was entitled to the proceeds. In which case, such proceeds could not be subject to garnishment for Walters' debt. On the other hand, the circumstances tend very strongly to show that, in the transaction between Walters and the Bank, a sale of the peaches *to the bank* was not, thought of. In fact, it is hardly probable that the bank understood or thought it was buying peaches. The assumption would be rather that it was dealing in commercial paper—the objects of its usual and ordinary business. However, whether there was a sale of the peaches *to the bank,* depends upon what was the intention of the parties to the transaction at the time, and this intention is not determined merely by what they now say about it, but also by the transaction itself viewed in the light of their acts and course of conduct under all the circumstances. We cannot say, as a matter of law, that there was no sale of the peaches to the bank. Hence, we cannot, upon a reversal of the judgment, direct a judgment to be rendered in plaintiffs' favor. Neither can it be said, as a matter of law, that there was a sale of the peaches to the bank. Indeed, a large portion of interpleader's case rests upon the oral testimony of the bank's cashier, and, as his credibility was a matter for the jury to pass on, the trial court could not direct a verdict in interpleader's favor. Nor does the testimony offered by plaintiffs conclusively show a sale of the peaches to the bank. It shows rather a sale to Ward Brothers and Walters' testimony that he refused to consent to the charging of the drafts back to his account may be referred as well to his view of the law as to the bank's right to do so, as to the view that he knew he had sold the peaches to the bank. In fact, he never at any time said he sold the peaches to the bank but did say he sold the peaches to Ward Brothers subject to their guarantee to the bank that they would pay so much per bushel for them.

We are, therefore, of the opinion that the case should have been submitted to the jury, under proper in-

structions, leaving it to them to say what was intended in the transaction between Walters and the Bank and who was the *owner* of the peaches at the time Ward Brothers received them. If the Bank took the bills of lading as mere security, then it released that security when it authorized the railroad to deliver the peaches without payment of the drafts. On the other hand, if it bought the peaches and paid for them by depositing the amount of the drafts to Walters' credit, then it was the owner of the peaches at the time of their delivery to Ward Brothers and consequently the owner of the proceeds of said fruit; and if the bank bought the peaches, it could not thereafter charge the drafts against Walters' account, thus rescinding the sale, without the latter's consent.

The reversal and remanding of the case on the feature considered, would still leave the question of garnishees' appeal undisposed of and as this question will arise upon a trial anew, it should be disposed of now.

It will be remembered that the answer of the garnishees says the peaches brought, less expenses and commissions, $520.62, but that Walters owed them $123.75 which they have deducted from $520.62, leaving $396.87 as the amount they owe. The judgment of the court was to pay over the full $520.62. It was stipulated between the garnishees and the interpleader that the $123.75 was a debt owed by Walters to garnishees over a matter entirely disconnected from the shipments involved. Hence, if before the peaches came into the interpleader's hands they were *owned* by the Bank and not by Walters, the garnishees, if they had notice of the Bank's interest therein, could not apply a part of the proceeds to pay Walters' debt to them. The attachment in this case being against a non-resident and jurisdiction being obtained only by virtue of the property attached— i. e., the money garnished, the proceeding is one *in rem*. [7 R. C. L. 777.] Being a proceeding *in rem* it is good against the world as to that property, and if any out-

sider wants to assert and protect his rights therein he must come in and do so.

The garnishees have asked the court to determine to whom the court shall pay the debt it owes. True, they say they owe only $396.87, but if interpleader is entitled to recover at all, garnishees do not owe Walters anything, but owe the whole $520.62 to the interpleader. It would seem that having asked the court to direct them to whom to pay the amount due, and the case being one *in rem,* and the garnishees not asking to participate in the litigation between plaintiffs and the interpleader to determine the ownership of the proceeds, the garnishees must abide the result of that litigation and if the interpleader wins they will have to pay the whole $520.62 while if plaintiffs win, the garnishees will have to pay only the $396.87.

The judgment is reversed and the cause is remanded. All concur.