The **FIRST NATIONAL BANK OF CLINTON**, Appellant,

v.

Vance **JULIAN**, Trustee in Bankruptcy of Roby C. Woody, d/b/a Woody Motor Company, Bankrupt, Appellee.

No. 18589.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1967.

Irving Achtenberg, Kansas City, Mo., for appellant, and Achtenberg, Sandler & Balkin, Kansas City, Mo., on the brief.

Phineas Rosenberg, Kansas City, Mo., for appellee.

Before VOGEL, Chief Judge, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

This is an appeal from a turnover order of the Referee in the Roby C. Woody bankruptcy proceedings, ordering the appellant, The First National Bank of Clinton (Bank), to pay over to the Trustee, $10,630.89 received as the result of "illegal, void, voidable and fraudulent preferences, liens, * * * assignments and encumbrances of bankrupt's money and property * * * "

Another appeal against this same bankrupt was heard by us in the case of Farmers Bank of Clinton v. Julian, Trustee, opinion filed this day, 383 F.2d 314, and that case is referred to for a more detailed factual statement on the bankrupt's operation and the standard of review. The District Court on review affirmed the Referee's turnover order. We reverse, as the Referee's findings are clearly erroneous.

The bankrupt, Roby C. Woody (Woody or bankrupt), had, since 1945, operated a franchise Cadillac and Oldsmobile dealership in Clinton, Missouri, and the appellant, along with other banks and financial institutions, extended credit, banking and financial services to him.

Beginning in July, 1954, Woody "floor planned" his used car inventory with the Bank under an arrangement whereby the Bank would loan Woody an agreed amount on certain used cars in his inventory, securing the loans by a note and chattel mortgage. The Bank also purchased some of the retail financing paper on cars sold by Woody. Under the floor plan arrangement a loan was made for thirty days with a right of renewal for sixty additional days.

On July 8, 1959, the Bank held thirteen notes and chattel mortgages on floor plan cars. These notes varied in dates from April 4, 1959, to July 1, 1959. All of the chattel mortgages were duly filed of record, as is necessary under the Missouri law to secure a valid lien. The Bank had placed a limit of $10,000.00 on the total outstanding floor plan loans. When a floor plan loan was made, the net proceeds would be deposited in Woody's regular checking account there, and an appropriate entry would be made in the liability ledger; when a loan was paid an offsetting credit entry would be made in the liability ledger and the paid note and chattel mortgage returned to Woody. Each loan was numbered and can be traced through the liability ledger.

On about July 8, 1959, the Bank learned that a replevin suit was being filed against Woody by the Commercial Credit Corporation, and that Woody was in financial trouble. Feeling insecure on its indebtedness, the Bank, under the provisions of its notes, declared all indebtedness due and payable. The Bank repossessed eleven of the thirteen mortgaged cars, one of the cars having previously been sold by Woody, and the other having been repossessed by GMAC. The Bank sold the repossessed cars for $6,790.00 and applied this amount on Woody's indebtedness.

The Bank also applied as a setoff, a checking account of Woody's designated as "Reserve Account". This was a separate account set up by Woody with the Bank in which the Bank would deposit the differential between the Bank's interest rate to Woody, and the interest rate actually received on the retail paper that Woody had sold to the Bank. Originally, on each floor plan loan $50.00 of the loan proceeds would also be deposited in this account; this amount was later reduced to $25.00, and no further charge was made against the floor plan loans after the reserve account reached $3,000.00.

The purpose of the "Reserve Account", according to the Bank, was to provide additional security to the Bank on Woody's actual and contingent indebtedness, and Woody had to receive approval of a bank official before any checks

could be drawn against this account. Woody testified that this reserve checking account was additional security for his recourse paper, but he couldn't say "Yes or no" as to whether this account was security for any indebtedness the Bank might have against him.

Woody made an assignment for the benefit of his creditors on July 9, 1959, and on the same day the Bank set off the balance in the reserve account against a $941.04 retail note in default and then applied the balance in the account of $2,625.89 to reduce Woody's floor plan debt.

A petition of involuntary bankruptcy was filed July 13, 1959. Woody answered the same day admitting insolvency, and an adjudication of bankruptcy and order of reference was made July 14, 1959.

The last loan made by the Bank to Woody was on July 1, 1959, in the amount of $1,215.00, which was secured by a 1957 Oldsmobile. Woody had also mortgaged this same car to GMAC, which company subsequently repossessed the car. The Trustee knew of GMAC's repossession of this car, and on December 14, 1959, filed a petition to abandon all claim and title to this car as the value was not in excess of the mortgage held by GMAC. An order to abandon was entered the same day but the Referee in his turnover order surcharged the Bank for $1,215.00, the amount of its loan, because the Bank "voluntarily allowed GMAC to pick up and keep the car to which (the Bank) held the certificate of title and had superior rights and lien under its floor plan mortgage".

■ Since the Referee's findings were affirmed by the District Court, we proceed to review them applying the clearly erroneous standard as set forth in General Order in Bankruptcy No. 47, Rule 52(a) F.R.Civ.P., as interpreted in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (" * * * the definite and firm conviction that a mistake has been committed."), O'Rieley v. Endicott-Johnson Corporation, 297 F.2d 1, 6 (8 Cir. 1961) (" * * * definite and firm conviction that a mistake has been committed * * * or * * * substantial error in the proceeding or upon a misapplication of controlling law, or * * * unsupported by any substantial evidence, or if they are contrary to the clear weight of the evidence"); and Magidson v. Duggan, 212 F.2d 748, 752 (8 Cir. 1954), (" * * * not supported by substantial evidence, contrary to the clear preponderance of evidence, or * * * based on an erroneous view of the law.").

■ We recognize the Referee's findings should not be disturbed except for cogent reasons based upon a fair application of the "clearly erroneous" standard of review.

■ In the turnover proceedings the Trustee carries the burden of proof to prove his case by clear and convincing evidence. Maggio v. Zeitz, 333 U.S. 56, 64, 68 S.Ct. 401, 92 L.Ed. 476 (1948); Oriel v. Russell, 278 U.S. 358, 362, 49 S.Ct. 173, 73 L.Ed. 419 (1928); Barry v. Crancer, 192 F.2d 939 (8 Cir. 1952). He must show by a preponderance of the evidence a void or voidable preference under the Bankruptcy Act. 3 Collier on Bankruptcy, § 60.62 concisely summarizes the Trustee's burden, as follows:

"The law places upon the trustee the unmistakable burden of proving by a fair preponderance of all the evidence every essential controverted element resulting in the composite voidable preference. A presumption arises that payments made by a bankrupt to creditor are valid, and the trustee seeking to recover such payments must overcome this presumption by adequate proof of a voidable preference."

And in § 23.10[2]:

"[T]he burden of proof in a turnover proceeding is at all times on the receiver or trustee; he must at least establish a prima facie case. After that, the burden of explaining or going forward shifts to the other party, but the ultimate burden or risk of persuasion is upon the * * * trustee".

We now proceed to consider the three separate aspects of the turnover order. The eleven chattel mortgages under

which the Bank repossessed the floor plan cars were held in paragraph 4 of the Referee's order to have been given the Bank "between June 6 and July 8, 1959" without consideration, and as being only possible "replacements for antecedent loans but that claimant's (Bank) records did not show that * * *."

The chattel loans were actually dated from April 3, 1959 to and including July 1, 1959, and the liability ledger on the floor plan car transactions for the period April 6 to July 1, 1959, shows credits and debits in identical amounts leaving a consistent balance of $10,000.00 loaned on these transactions, which was the loan limit imposed by the Bank. After July 1, a credit of $865.00 was entered, bringing this liability down to $9,135.00.

As the floor plan cars were sold, Woody would give a new note and chattel mortgage on more recently traded-in cars and obtain release of the mortgaged cars that were sold by him, thus utilizing his loan limit, but each note and chattel mortgage was given for a present valuable consideration of either money or in payment of an existing validly secured loan on a floor plan car. The chattel mortgage on the floor plan car that had been sold would then be released and the new loan made on the more recently acquired floor plan car would not be in payment of an antecedent debt.

Even if the new loan is considered to have been made for the purpose of paying off the old loan this would not constitute a preference under § 60(a) of the Bankruptcy Act. That section applies to transfers of property for antecedent debts. Any exchange of property of equal value within the four month period preceding bankruptcy is not a transfer in payment of an antecedent debt, and would not constitute a preference.

Woody was legally obligated to discharge the chattel lien on the car he had sold and could only obtain this discharge by making a new loan on different security to pay the current obligation on the car he desired released from the chattel lien of the Bank.

Under the arrangement with the Bank, Woody's original loan of thirty days on floor plan cars could be extended up to sixty additional days. If the car was not sold before the expiration of the sixty day additional due date, this loan must be replaced with another secured loan.

The substitution, exchange, or renewal of securities does not constitute a preference if there is no diminution of the debtor's estate. To show a diminution of the debtor's estate the securities exchanged must be greater in value than the old securities and then a voidable preference may exist for the difference in value only. Walker v. Clinton State Bank, 216 F.2d 165 (8 Cir. 1954); Blue v. Herkimer Nat. Bank, 37 F.2d 663 (2 Cir. 1930), cert. denied 281 U.S. 750, 50 S.Ct. 354, 74 L.Ed. 1162; Schreiber v. Colt, 80 F.2d 511 (10 Cir. 1935); 3 Collier on Bankruptcy, § 60.21.

A renewal of a note by marking the old note "Paid" and using the proceeds of the new note to pay the old note, does not constitute preferential payment of the old note. Blue v. Herkimer Nat. Bank, supra, and the giving of a new chattel mortgage in renewal of an old chattel mortgage, even though the mortgagor is insolvent at time of new chattel mortgage does not constitute a voidable preference. "It is a narrow and mistaken view to regard the new mortgage as a transaction independent of the prior mortgage and the relations of the parties thereunder." Schreiber v. Colt, 80 F.2d 511 (10 Cir. 1935).

In addition to the substituted notes and mortgages, the evidence indisputably shows a deposit to Woody's regular bank account of $3,941.00 on July 1, 1959, which sum was loaned by the Bank to Woody on the specific loans identified as follows:

No. 122—dated 6–30–59 for $700.00 on a 1956 Chevrolet pickup, liability ledger No. 15742;

No. 123—under date of 7–1–59 for $1,100.00 secured by 1956 Oldsmobile, liability ledger. No. 15745;

No. 124—under date of 7–1–59 for $291.00 secured by 1953 Ford, liability ledger No. 15746;

No. 125—under date of 7–1–59 for $1,215.00 secured by 1957 Oldsmobile, liability ledger No. 15744.

The loans, together with loan No. 121 for $635.00, total $3,941.00 and the deposit slip listing the loans is, of course, in the same amount. The loan No. 121, liability ledger No. 15743, shown on the deposit slip is not listed among the exhibits, but it was made as evidenced by the deposit slip and the checking account ledger, and the proceeds deposited to Woody's account. All of these loans are reflected in the deposit slip of July 1, 1959. There is a transposition of the note numbers used for Woody's identification and the amount of the proceeds of that loan, but the numbers can be matched up with the amount and the total, together with the Bank's liability account ledger, is correct. The transposition error is apparent and of no consequence. These loans were made for a present valuable consideration and the proceeds deposited to the bankrupt's regular checking account.

The Referee's error is apparent on the documentary evidence and his finding that these secured loans were made for antecedent debts is clearly erroneous and devoid of any evidentiary support.

The only evidence on which the Trustee seeks to set aside these usual and ordinary business transactions comes as a result of the Trustee's cross-examination of the bankrupt in asking questions that are factually inaccurate and misleading on the record.[1]

Further, Woody testified he received the money on these notes but the Trustee without justification seeks to characterize all of these notes and chattels as antecedent debts on the basis of his factually inaccurate questioning of Woody and upon the response of a Vice-

---

1. The colloquy referred to above is as follows:

After handing Woody a copy of the bank statement he was asked if the chattel mortgage he executed on June 6, 1959 in the amount of $775.00 was deposited to that account and he answered, "I don't see it on here". The liability ledger account on the floor plan loans shows the amount of $775.00 deposited to this account for loan No. 15,595 under date of June 6, 1959, and the checking account ledger shows a number of deposits on that date with one in the amount of $1,092.78. There is no showing whether the $775.00 amount was deposited in the checking account or was used to pay off a prior secured loan that Woody wanted released, but in any event Woody was given credit on the Bank's record for this loan. Then the following questions were asked of Woody:

"Q. On June 20th you executed a chattel mortgage, note #110 for $260.00; and you executed a mortgage for $875.00, note #111; and note #109 for $365.00. Do you see a deposit to your account in the First National for any of those amounts or a total of them on June 20th?

"A. No, sir, not on that date.

"Q. You say you do or don't?

"A. I do not.

"Q. All right. And there was an additional loan on that same day for $500.00, note #116. Do you see any deposit for that amount?

"A. Not for that amount, sir."

Actually loans #110, #111 and #109 were made on June 19, 1959 and loan #116 was made on June 23, 1959. Woody's liability ledger on the floor plan cars shows debits to this account on the above questioned loans, as follows: Under date of June 19, 1959: liability ledger loan #15,665, Woody's note #109 for $365.00; liability ledger loan #15,666, Woody's note #110 for $260.00; liability ledger loan #15,667, Woody's note #111 for $875.00; which loans together with loans numbered 15,669 for $511.00, 15,670 for $230.00, 15,608 for $620.00 total $2,861.00. The regular checking account ledger shows a deposit of $2,861.00 on June 20, 1959. Likewise, Woody's note #116 for $500.00 dated June 23, 1959 (not June 20), Bank's liability account #15,685, is reflected in Woody's liability ledger under date of June 23, 1959 and is part of the $3,939.00 deposit of that same date shown on Woody's regular checking account ledger.

President of the Bank given upon cross-examination.[2]

A brief review of the record evidence shows that on the execution of all of the notes and chattels in question that Woody either received cash on each loan made, with the proceeds being deposited to his account, or else the secured loan was made to pay off another secured loan that was in turn released to Woody. A present valuable consideration is evident in either event and there can be no preference nor were there any of these loans for antecedent debts as that term is used in § 60(a) of the Bankruptcy Act.

There is no evidence whatsoever to show any diminution of Woody's estate by any exchange of securities; while on the contrary, the evidence unequivocably shows that all of the thirteen notes and chattels in question were given either for a present valuable consideration of cash or were a valid exchange of securities on secured loans.

Section 60(a) of the Bankruptcy Act on preferences applies to transfers of property for antecedent debts but an exchange of property of equal value within the four-month period preceding bankruptcy does not constitute a preference for the reasons noted. The Referee's finding that eleven of these chattel mortgages were invalid is clearly erroneous.

The record shows that the Bank repossessed its eleven cars on July 8, 1959, and that the Farmers Bank repossessed its cars on either July 4 or 5, 1959. Also GMAC must have repossessed its chattel lien on the 1957 Oldsmobile prior to July 8 as the car had already been repossessed when the Bank commenced enforcement of its chattel liens.

The Referee in his turnover order referred to a uniformity of action among the Bank, the Farmers Bank of Clinton and Commercial Credit Corporation, in repossessing the cars on which they claimed chattel liens, holding that this was done secretly at night with the "bankrupt's active, unusual and extensive cooperation". The Referee's finding on this issue, is not only incorrect but immaterial. There is nothing sinister or illegal about a unity of action or a night repossession if the parties have a valid lien that is capable of being enforced. The test is the validity of the security instrument as against other creditors, and not the time or even unity of purpose in executing possessory rights contained in the security instruments.

The Referee found that the bank account denominated as "Reserve Account" was a special account established for the purpose of paying defaults "in retail recourse paper purchased by the bank from Woody", that "the relation of debtor and creditor did not exist between them with respect to said account;" and ordered the $2,625.89 set off on this account turned over to the Trustee. This checking account was established in July, 1954 in the name of Woody Motor Company "Reserve Account". The ledger sheet of the account carried the typewritten notation that "all withdrawals are to be approved by G. W."

This account was created to receive a $50.00 collateral deposit on each floor plan loan to serve as a reserve for payment of the Bank's loans, apparently made in connection with the floor planning obligation and was later extended to serve as a collateral account for the purchasing of retail recourse paper from Woody. The account was started and mainly built up from the $50.00 deposits resulting from the floor plan loans. This deposit amount was later reduced to $25.00 and was discontinued when the account reached $3,000.00.

---

2. "Q. Did you give, always give Mr. Woody a check or deposit something to his account when he gave you a chattel mortgage?

"A. It is possible some of those notes replaced notes.

"Q. That were antecedent debts?

"A. That is right.

"Q. That is what I was thinking.

"A. I don't know.

"Q. Some of these obligations you can't tell. Does your record show that?

"A. No."

In addition to the deposits from the floor plan loans the differential in interest between the rate charged on the retail paper and the rate charged Woody was also deposited to this account. An analysis of the account shows most of the deposits were in multiples of $25.00 and $50.00, and the account built up quite rapidly from the initial deposit of $22.50 on July 30, 1954 to over $3,000.00 on July 18, 1955.

The Bank's vice-president who had to approve withdrawals testified that the account was for the purpose of protecting the Bank on the floor plan loans and on the retail recourse paper and "if we hadn't got a reserve account and was unable to do it that way, we wouldn't have made the loans". Woody testified that the account was for additional security on recourse paper and he couldn't "say yes or no" on whether it was also security for any indebtedness.

The evidence on this issue of the oral understanding between Woody and the Bank on the use and purpose of this reserve account preponderates in favor of the Bank. The Bank's evidence is positive and the circumstances indicative of a reserve collateral account for purpose of paying losses on floor planned and retail recourse paper. The only evidence produced by the Trustee is Woody's statement that he couldn't say.

 However, as a matter of law, the account was a general checking account created for the purpose of securing the Bank against losses of some kind. The only restriction on the account was that Woody could not draw checks on it without the approval of the Bank. There was no agreement that the account was to be kept separate and isolated from the other checking accounts in the Bank. That is, the Bank did not and was not under any obligation to hold this money separate and apart from its other funds and to refrain from using the funds in its business. This type of reserve account constitutes a general deposit for a special purpose which creates a general deposit that the Bank may use in its

regular business operations, the Bank becoming a debtor in the amount of the deposit. See, 3 Scott on Trusts §§ 526 and 530 (1939).

 Under Missouri law, to be a trust deposit so that the title to the funds deposited does not pass to the bank and no debtor-creditor relationship is created, there must be "an agreement, express or implied, that it shall not be commingled with the other assets of the bank and used as its own, but shall be kept intact as a special deposit for a specific purpose". Security Nat. Bank Savings & Trust Co. v. Moberly, 340 Mo. 95, 101 S.W.2d 33, 37 (Mo.1936).

 The determinative factor of whether a deposit is special in the connotation that it does not create a debtor-creditor relationship "is the right or not of the bank to so commingle and use the deposit". Vandivort v. Sturdivant Bank, 77 S.W.2d 484 (Mo.App. 1934). The *Vandivort* case was expressly approved by the Supreme Court of Missouri in the Security Nat. Bank case. The *Security Nat. Bank* case, supra, held that funds deposited by a trustee in a special account designated as "Trustee Account", the deposits being made for the sole and exclusive purpose of paying the principal and interest on a mortgage was not a "special deposit", but constituted a general deposit. That case also pointed out that Missouri is in harmony with the greater weight of authority represented in Restatement Trusts § 12 comment (h):

> "If money is deposited in a bank for a special purpose the bank is a trustee or bailee of the money if, but only if, it is the understanding of the parties that the money deposited is not to be used by the bank for its own purposes."

Restatement of Trusts, 2d contains with some elaboration the same principle in § 12, comment (1):

> "A general deposit of money in a commercial bank does not create a

**338**

trust, but a relation of debtor and creditor * * *. This is true although the depositor is a trustee * * *. If money is deposited in a bank for a special purpose, the bank is not a trustee or bailee of the money unless it is the clear understanding of the parties that the money deposited is not to be used by the bank for its own purposes."

The general rule is that a deposit in a bank is presumed to be a general deposit and that the relationship created between the bank and the depositor is that of debtor and creditor, and the burden of proving that a deposit is for a special purpose is on the party seeking to establish it as a special deposit. Hershey v. Northern Trust Co., 342 Mo. 90, 112 S.W.2d 545, 549 (Mo. 1937). To the same effect is the general statement in 10 Am.Jur.2d Banks § 363 which reads in part:

"In the absence of an agreement and proof to the contrary, a deposit is presumed to be general rather than special, and the burden evolves upon the party who claims that the deposit is a special one to show that it was received by the bank with the express or clearly implied agreement that it should be kept separate from the general funds of the bank and that it should remain intact * * *." Union Properties v. Baldwin Bros. Co., 141 Ohio State 303, 47 N.E.2d 983, 149 A.L.R. 725.

There is no evidence in the record of any agreement, express or implied, that the funds deposited in this reserve account were to be kept intact, separate and apart from the other funds of the Bank, and the Referee's ruling in that respect is clearly erroneous. The account constituting a general deposit is subject to the Bank's right of set off as recognized at common law. Adelstein v. Jefferson Bank & Trust Company, 377 S.W.2d 247, 251 (Mo.1964); Cochrane v. First State Bank of Pickton, 198 Mo. App. 619, 201 S.W. 572 (1918).

This right of set off of a debt due a creditor from a bankrupt against the debt owing by the creditor is specifically recognized by § 68 of the Bankruptcy Act, 11 U.S.C. § 108:

"(a) In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

New York County National Bank v. Massey, 192 U.S. 138, 147, 24 S.Ct. 199, 48 L.Ed. 380 (1904) recognizes the common law right of set off and its express recognition in the Bankruptcy Act. The Bank has the right to exercise that right of set off within four months of the bankruptcy and may do so even before the adjudication of bankruptcy. Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268 (1913); Studley v. Boylston National Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313 (1913); Farmers Bank of Clinton v. Julian, Trustee, 383 F.2d 314 (8 Cir. Aug. 8, 1967); Fourth Nat. Bank of Wichita v. Smith, 240 F. 19, 27 (8 Cir. 1916). The Referee's finding on this setoff issue is clearly erroneous.

The final aspect of the Referee's turnover order under appeal is the surcharging of the Bank for the amount the Bank had loaned Woody on the July 1, 1959 loan of $1,215.00 secured by a 1957 Oldsmobile, which car had also been mortgaged to GMAC. The basis of the Referee's order was that the Bank had "voluntarily allowed GMAC to pick up and keep the car covered by claimant's floor plan mortgage to which claimant held the certificate of title and superior rights and liens (so that) claimant thereby became and is indebted to the trustee herein for the sum of $1,215.00."

The legal basis for this order was that under the Missouri law a transfer of the certificate of title is necessary to pass good title. See, Bordman Investment

Company v. Peoples Bank of Kansas City, 320 S.W.2d 72,[3] (Mo.App.1958).

On the record it appears that the GMAC chattel mortgage was prior in time as GMAC alleged it to be prior, and the Trustee had introduced no evidence to the contrary. Also the Bank did not become aware of Woody's financial plight and did not take any action to enforce any of its possessory rights until after it learned of the replevin suit filed by GMAC on this particular 1957 Oldsmobile. It would appear that the Bank had the certificate of title though the evidence on that issue is vague in that a Bank official testified they had most of the certificates of title, but this issue was not pursued to a conclusion, and we will not discuss it further because we do not think it is dispositive of the issue.

There is no evidence that the Bank ever had possession of this car or that it allowed GMAC to pick up the car, or that it even had any authority to allow GMAC to pick it up. The car was in Woody's possession at all times until replevied by GMAC.

■ On a turnover order the burden is on the trustee to show that the property or proceeds are a part of the bankrupt's estate, and he must prove that the person proceeded against has either possession or control of the property or proceeds demanded. See Collier on Bankruptcy, § 23.10. In this case the Bank neither had possession nor control. The Supreme Court in Maggio v. Zeitz, 333 U.S. 56, at page 64, 68 S.Ct. 401, at page 405, 92 L.Ed. 476 (1947) concisely states the rule:

"This court has said that the turnover order must be supported by 'clear and convincing evidence', Oriel v. Russell, 278 U.S. 358, [49 S.Ct. 173, 73 L.Ed. 419], and that includes proof that the property has been abstracted from the bankrupt's estate and is in the possession of the party proceeded against. It is the burden of the trustee to produce this evidence, however difficult his task may be."

■ Disregarding the inconsistent findings that all of the Bank's chattel mortgages except the one on the 1957 Oldsmobile were invalid, the Referee has no right to surcharge the Bank for something it did not get or have. The Trustee later abandoned this car to GMAC, thereby recognizing the validity of GMAC's claim to the car. Since Woody had obviously given duplicate mortgages on this car, the Bank had no obligation upon pain of penalty by the Bankruptcy Court to fight GMAC's allegedly prior claim through the courts.

The Bank had the right of setoff, which it exercised, thus extinguishing its claim. (See, Farmers Bank of Clinton v. Julian, Trustee, 383 F.2d 314 (8 Cir. Aug. 8, 1967). The Trustee was free to pursue this car which had been

---

3. The *Bordman* case held the title of the finance company was good as against a bank who had financed the purchaser of a car sold by an automobile dealer without satisfying the finance company's loan. The holding was based upon the finding that the finance company had not authorized the automobile dealer to actually sell the automobile and then bring the purchase money to the finance company, but had only authorized the dealer to find a prospective purchaser for the automobile and then pay off the note on it, after which the automobile dealer would receive the title certificate and then complete the sale. The court recognizes the general rule at page 76 of 320 S.W.2d:

"In almost all jurisdictions the recognized rule is that where a mortgagee of an automobile or other chattel knows the mortgagor is a dealer, buying to sell the automobile or other chattel in the regular course of business, and consents to its sale by the mortgagor, the purchaser takes free from the mortgagee's lien. Annotation, 136 A.L.R. 821;" and citing numerous cases.

The Missouri court differentiated *Bordman* from this general rule because of the fact the finance company did not actually or impliedly authorize the dealer to sell the car before paying off the note and obtaining the title certificate. We therefore do not decide on the facts of the case at bar, the full import of Missouri law on certificates of title.

collateralized twice, if he desired, but he decided to abandon the collateral to GMAC and secured a court order to that effect. There is no equity in the Trustee's position on this point, and the Referee's findings of a surcharge of $1,215.00 against the Bank is clearly erroneous as a misinterpretation of the law and is also devoid of substantial evidentiary support.

The Referee's turnover order entered June 10, 1964, against the appellant, First National Bank of Clinton, is reversed.