**Reuben and Sandra ELDRIDGE, Appellants,**

v.

**Jerry WAUGH, Appellee.**

**No. B–C–94–57.**

United States District Court, E.D. Arkansas, Northern Division.

Oct. 10, 1995.

Donna Jean Wolfe, McHenry & Mitchell, Little Rock, AR, for appellants.

Jeffrey E. Hance, Hance & Hance, P.A., Batesville, AR, for appellee.

James C. Luker, Trustee, Wynne, AR.

### MEMORANDUM & ORDER

SUSAN WEBBER WRIGHT, District Judge.

Reuben and Sandra Eldridge appeal the judgment entered by United States Bankruptcy Judge Mary Davies Scott finding that any debt or claim owed by debtor Jerry Waugh to the Eldridges was dischargeable under 11 U.S.C. §§ 523, 727. The Court

reverses the Bankruptcy Court's decision and holds that the debtor's conduct was willful and malicious within the meaning of 11 U.S.C. § 523(a)(6), and therefore the debt was non-dischargeable.

Jurisdiction in this Court is proper under 28 U.S.C. § 158.

■■■■ This Court sits as an appellate court for the decisions of the Bankruptcy Court. Bankruptcy Rule 8013. As such, the Court's role in the bankruptcy proceedings is limited. Legal conclusions are reviewed *de novo* on appeal, while factual findings will not be set aside unless "clearly erroneous." *Id.; In re Muncrief*, 900 F.2d 1220, 1224 (8th Cir.1990). Matters and decisions within the discretion of the bankruptcy judge will not be disturbed absent plain error or abuse of discretion. *In re Lawless*, 79 B.R. 850, 852 (Bankr.W.D.Mo.1987). Under the "abuse of discretion" standard, the Court's inquiry is not how it would have ruled, but whether reasonable persons could differ as to the propriety of the bankruptcy judge's decision. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984); *In re Carter*, 100 B.R. 123, 126 (Bankr.D.Mo.1989).

### I.

The debtor, Jerry Waugh, was president and fifty percent shareholder of Rising Fast Trucking Company ("RFTC").[1] On July 14, 1986, an RFTC truck driver was involved in an accident with a Trailways passenger bus being driven by Reuben Eldridge, who was severely injured. According to the Eldridges' brief, the accident occurred when an RFTC truck driver, who was under the influence of marijuana, made a u-turn on the interstate at 3:30 a.m. to change the direction in which he was traveling. The lights were off on the 18–wheel truck and trailer rig, which blocked the entire interstate. The bus hit the side of the trailer head-on; Eldridge and several bus passengers suffered injuries.

The Eldridges filed suit against RFTC in 1986. The trial was bifurcated on the issues of liability and damages. In August 1990, a jury found RFTC liable. Prior to the trial on damages, the Eldridges and RFTC in April 1992 entered into an agreed judgment in the amount of $3 million in compensatory damages.[2]

In February 1993, Waugh filed a voluntary Chapter 7 petition in bankruptcy. No objections to discharge or dischargeability were filed by the Eldridges within the time limits of the Federal Rules of Bankruptcy Procedure.

The Eldridges filed suit in Pulaski County Chancery Court against Waugh, RFTC and thirteen affiliated corporations on April 16, 1993 to set aside transfers of property and obtain satisfaction of their judgment. Waugh's answer raised the defense of a bankruptcy discharge, which he obtained on July 7, 1993. In response to notice of the state court suit, Waugh sought to reopen his bankruptcy case to determine if the claim asserted in the state court suit had been discharged. The Eldridges asserted the debt was non-dischargeable because they did not receive notice of the bankruptcy proceeding in sufficient time to object to any discharge. They also contended any debt owed by Waugh to the Eldridges is non-dischargeable under 11 U.S.C. § 523(a)(6).[3] They alleged Waugh used his corporations maliciously and willfully to prevent the Eldridges from obtaining satisfaction of their judgment against the corporation.

The Bankruptcy Court found the Eldridges did not receive notice of Waugh's bankruptcy case. That portion of the court's ruling was not appealed.

### II.

The issues on appeal are: 1) whether the bankruptcy court applied the correct burden of proof for a cause of action brought under

---

1. The other shareholders were members of the Clem Moore family ("the Moores").

2. As of November 1994, the Eldridges have received approximately $ 59,000 in satisfaction of the judgment.

3. *11 U.S.C. § 523(a)(6) provides that a discharge under 11 U.S.C. § 727, 1141 or 1328(b) "does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity."*

11 U.S.C. § 523(a)(6), and 2) whether the bankruptcy court's finding that Waugh's actions were the result of poor business judgment rather than a willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6) was clearly erroneous.

■ The Bankruptcy Court noted that a division exists among the jurisdictions as to the burden of proof under Section 523(a)(6). Some courts require creditors to demonstrate the merits of their dischargeability claims. Others require only that notice of the bankruptcy was not provided. The third view requires that the creditor show it has a "viable or colorable claim", but does not require the creditor to prove his claim on the merits.

In this case, the Bankruptcy Court concluded the appropriate burden of proof was that of requiring the creditor to demonstrate the merits of its claim.

In making its decision on the burden of proof, the Bankruptcy Court pointed to a district court decision from the Western District of Arkansas, *In re Crull*, 101 B.R. 60, 61 (Bankr.W.D.Ark.1989), which requires creditors to demonstrate the merits of their claim. In light of that case, the Court finds that the correct burden of proof was applied in this case.

### III.

■ Concerning the second issue, the Eldridges argue the debtor used his corporations maliciously and willfully to prevent them from obtaining satisfaction on their judgment. The Bankruptcy Court framed the issue as "whether the debtor actually took such actions, transferring assets, with the intent or purpose of preventing the Eldridges from executing on the assets." [Findings of Fact and Conclusions of Law, September 9, 1994 at 8–9.] The Court concluded, "Although it appears the debtor's actions with regard to his corporations were imprudent and lacking in business judgment, the Court cannot determine that his decisions and actions were done wilfully and maliciously with respect to the Eldridges. The Court does not believe that the actions were targeted at the Eldridges, or that they intended to

cause harm to them." [Findings of Fact and Conclusions of Law at 10.]

■ Under Section 523(a)(6), "willful" and "malicious" are separate concepts that each must be present for non-dischargeability. *In re Long*, 774 F.2d 875, 880 (8th Cir.1985). A "willful" act is one defined as deliberate or intentional. *Id.* The Eighth Circuit defines "malice" as conduct "targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm." *Id.* at 881. The Eighth Circuit's intentional harm standard requires the Eldridges to establish intentional behavior targeted at them by Waugh. *In re Grisham*, 177 B.R. 306, 311 (Bankr. W.D.Mo.1995). An act may be "malicious" within the meaning of Section 523(a)(6) even though the debtor does not act with personal hatred, spite or ill will. *In re Williams*, 173 B.R. 912, 914 (Bankr.W.D.Ark.1994). Malice may be demonstrated by evidence that with knowledge of the creditor's rights, the debtor took action in violation of those rights. *Id.*

■ The Court has extensively reviewed the file and the briefs in this case and has read the transcripts of the bankruptcy hearings. A reviewing court must accept a bankruptcy judge's factual findings unless they are clearly erroneous. *First National Bank of Clinton v. Julian*, 383 F.2d 329, 333 (8th Cir.1967). The Court believes the Bankruptcy Court's factual finding that the debtor's actions were not willful and malicious with respect to the Eldridges is clearly erroneous. "A finding is 'clearly erroneous' when, although there is evidence to support it, the court reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 151 B.R. 492, 494 (Bankr.W.D.1993), *aff'd* 9 F.3d 680 (8th Cir.1993). The determination of a party's intent, for purposes of Section 523(a)(6), is a question of fact which should be reviewed under the "clearly erroneous" standard. *In re Phillips*, 882 F.2d 302, 305 (8th Cir.1989).

This Court believes the evidence as a whole in this case reveals an intentional pattern of activity by the debtor targeted at harming the financial interests of the El-

dridges and other creditors and at improving the financial condition of the RFTC shareholders.

## IV.

The accident occurred on July 14, 1986, and the Eldridges filed suit that same year. In 1986, Waugh started a new trucking company, Rising Fast Transport ("RF Transport"), which was operated as "virtually the same entity" as RFTC. [Findings of Fact and Conclusions of Law at 9.] The Bankruptcy Court stated that it believed Waugh's testimony about the timing and motivation for the creation of RF Transport.[4] Even if that testimony is believed, Waugh's subsequent actions indicate an intent to remove assets from RFTC.

New trucks were added to RF Transport starting in July 1986, but no new trucks were added to RFTC after that time. [Tr. June 16, 1994 Hearing, 65.][5] Between December 1, 1986 and August 13, 1987, a third Waugh corporation, Rising Fast Leasing, Inc. ["RF Leasing"], purchased 59 tractor vehicles financed by Navistar Financial Corporation ["Navistar"]. [See def.'s ex. 7 at ¶ 11.] To induce Navistar to finance the vehicles for RF Leasing, RFTC and RF Leasing executed an interlocking guaranty for the vehicles on March 18, 1987. [See def.'s ex 7 at ¶ 36 and attached exhibits.] As a result, RFTC, the company then facing the Eldridges' lawsuit, incurred a debt of more than $2.4 million while assets were added to another company.

The audit report for the year ending March 31, 1986, showed RFTC's current assets at $2,377,000 and current liabilities at $2,787,000, making liabilities exceed assets by roughly $400,000. [Tr. at 30; def.'s ex. 39.] Cash assets were $497,987. [Def.'s ex. 39.] The audit indicated that a million-dollar note was coming due in May 1987. [Tr. at 116.]

John Ed Welch, a certified public accountant with the firm that prepared the audit, testified that a qualified opinion was issued in conjunction with the 1987 audit report for RFTC because there were related party transactions that were not disclosed and because of the uncertainty of RFTC's financial future due to the potential lawsuits from the 1986 wreck. [Tr. at 29, 44.][6] In 1987, total current assets were $1,883,000, and current liabilities were $3,566,000. [Tr. at 31.] There was a net loss of $516,500 compared to a net income of $222,915 in 1986 and a net income of $540,952 in 1985. [Tr. at 33, 36; def.'s ex. 39.] Retained earnings dropped from $1,247,000 in 1986 to $34,000 in 1987. [Tr. at 186.] From 1979 through 1986, RFTC's tax returns showed a loss of $680,000. In 1987 alone, the loss was an additional $717,000 plus $696,000 more paid in dividends. [Tr. at 47.]

RFTC, which is an S-corporation, had never paid any dividends to shareholders until 1986. [Tr. at 65.] According to the RFTC Board of the Directors' minutes and Waugh's testimony, dividends were approved twice in April 1986, twice in May 1986, and three

---

4. From 1979 through July 1986, Waugh added trucks to RFTC, which in 1985 had 150 trucks. [Tr. June 16, 1994 Hearing, 149–50.] Waugh testified new trucks could not be added to RFTC at the end of 1985 because the company had pledged the accounts to Independence Federal Savings for a loan of "about a million" dollars and could not receive additional financing on the accounts. [Tr. at 151–52.] Waugh testified the company had a cash shortage and that in order to finance growth, shareholders put in $200,000 in March 1985 and $100,000 in September 1985. [Tr. at 59, 62.] They received stock in exchange. Waugh testified that RFTC board members decided they would start RF Transport to get a new set of accounts receivable to use for borrowing money for growth. [Tr. at 152–53]. The Board of Directors' minutes show that the creation of RF Transport was authorized on June 27, 1986

[Def.'s ex. 26.], prior to the accident; the Articles of Incorporation were filed August 29, 1986. [Def.'s ex. 6.] Waugh was a fifty percent shareholder.

5. Between April 2, 1985 and July 31, 1985, Navistar Financial Corporation ["Navistar"] financed 43 tractor vehicles for RFTC. [See def.'s ex. 7 at ¶ 5]. From January 27, 1986 through July 28, 1986, Navistar financed 51 tractor vehicles for RFTC. [See def.'s ex. 7 at ¶ 8.]

6. After the accident, RFTC loaned the shareholders $600,000, authorized July 23, 1986, and $200,000 authorized on July 30, 1986. [Def.'s ex. 27, 28; Tr. at 95, 154–55.] Waugh testified the loans were repaid. No loan documents were introduced at the hearing, but canceled checks from Waugh were received into evidence.

times in June 1986. [Def.'s ex. 20–26].[7] All of these dates are of course before the wreck.[8] The Eldridges argue on appeal that the minutes are "biased," "unsupported," and are "in direct conflict" with audit records. [Brief of Appellants at 31.] Welch, the certified public accountant for RFTC, stated that the only dividends the audits showed were paid after the accident, on July 28, 1986 and July 31, 1986 in the amount of $800,000. [Tr. at 20, 35.]

The Eldridges argue on appeal that Waugh's testimony establishes that the RFTC's minutes on the payment of dividends can not be believed, at least in regard to the first payment date, April 7, 1986. [Brief of Appellant at 30.] Waugh testified he used dividend money to pay off a $262,000 debt from 1984 and 1985 he owed to RFTC and the payment was made on March 31, 1986. [Tr. at 190, 197.] The March 31, 1986 payoff date would have made it impossible for Waugh to have satisfied the debt with the first dividend check. Waugh described the transaction as "just a swap out to get the debt I owed Rising Fast Transport Company off the books. I paid the debt. They paid me a dividend actually so I could pay the debt." [Tr. at 191.]

The audit report was published on May 23, 1986. Welch, the accountant, testified that between the time the audit report was finished in March and the time it was published in May, the auditing firm would have conducted an inquiry to determine if the company's financial position had materially changed. [Tr. at 17–19.] If the auditing firm had learned of dividend payments, it likely would have included them in the report, Welch stated, but the firm did not determine that any dividends were paid between March and May. [Tr. at 18–19.]

Richard Mann, a certified public accountant who was an expert witness for the Eldridges, testified it was very uncommon for an S-corporation such as RFTC to distribute dividends when the corporation has no accumulated income that would be reported by individual shareholders. [Tr. at 123.] Usually S-corporations distribute dividends only for the current or prior year's profit. [Tr. at 123.] Taxable income in 1985 for RFTC was $1,266.00 [Def.'s ex. 35.]

The Bankruptcy Court itself noted that "at the time the dividends were authorized in 1986, there were reasonable grounds to believe that the corporation would be unable to pay creditors as debts became due." [Findings of Fact and Conclusions of Law at 11.]

The Eldridges also persuasively argue that the Bankruptcy Court had no factual basis for deciding that "[a]ccidents involving the trucking company had previously occurred without substantial damage being sustained to the corporation...." [Findings of Fact and Conclusions of Law at 12.] During the hearing, the Bankruptcy Court did not permit Waugh to testify as to the amount of the average liability claim that had been paid by RFTC during the period from 1979 up to the 1986 collision. [Tr. at 162–63.] This lack of "substantial damage" from previous accidents was apparently one factor in the Bankruptcy Court's finding that Waugh did not believe the Eldridges' lawsuit "to be an overwhelming concern of the corporation such that assets should be transferred." [Findings of Fact and Conclusions of Law at 12.] [9]

In November 1989, Waugh and other shareholders sold, among other assets involving different companies, RFTC's trade name, telephone number, customer list, sales record, and goodwill to Alliance Transportation Co. ("Alliance") for $1,000. [Def.'s ex. 10.]

---

7. The amounts and dates according to the minutes of the RFTC board meetings were: April 7, 1986, $550,000; April 28, 1986, $10,000; May 12, 1986, $50,000; May 20, 1986, $6,000; June 11, 1986, $10,000; June 23, 1986, $30,000; and June 27, 1986 $40,000. [Def.'s ex. 20–26.]

8. Waugh testified that of the $550,000 April 7, 1986 dividend, one-half went to him and one-half to the Moores. [Tr. at 189.]

9. The Court notes with interest the testimony of Dale Cole, president of Worthen National Bank of Batesville, who stated that Waugh told him he had transferred RFTC assets to his own children, to Clem Moore, and to some trusts in order to remove the assets from the reach of some creditors. [Tr. at 112.] Waugh testified that the conversation with Cole concerned assets of Rising Fast Rentals Inc., not RFTC [Tr. at 166.] The Bankruptcy Court believed Waugh's explanation. [Findings of Fact and Conclusions of Law at 12.]

At the same time, he negotiated two separate contracts for himself with Alliance: a one-year employment contract for $66,756 [Def.'s ex. 12] and a four-year consulting contract for $25,000 a year. [Def.'s ex. 11.] In December 1989, he assigned the consulting agreement and other payments from to Navistar. [Def.'s ex. 13.] RFTC and Rising Fast Leasing, Inc. ["RF Leasing"] owed Navistar $1.8 million. Waugh was jointly and severally liable with RFTC and RF Leasing for the debt. In return for the assignment, Waugh and the Moores were released from any liability to Navistar. There was no release for RFTC or RF Leasing. Later in December of 1989, Waugh agreed to a $2.9 million consent judgment in favor of Navistar against RFTC and RF Leasing. That judgment released him individually. [Def.'s ex. 8.] These actions, taken after the accident, harmed the Eldridges interests by selling RFTC's assets for a low price.

If there is a debt against Waugh individually in connection with the $3 million consent judgment against RFTC stemming from the accident, the Court finds that it has not been discharged in bankruptcy because it falls within the willful and malicious exception to dischargeability.[10] After the accident, Waugh used RFTC's assets to receive debt release for himself, to the detriment of the Eldridges. Considering the overall financial picture of RFTC, the Court believes that after the accident Waugh engaged in an intentional course of conduct designed to insulate assets from the Eldridges. Consequently, the Court finds "clearly erroneous" the Bankruptcy Court's determination that Waugh's actions were the result of poor

judgment and not targeted at the Eldridges. The decision of the Bankruptcy Court on the issue of dischargeability under Section 523(a)(6) should be, and hereby is, reversed.

IT IS SO ORDERED.

10. It appears to this Court there is ample evidence which would permit the Arkansas court to pierce the corporate veil and hold Waugh personally liable for the RFTC debt. Under Arkansas law, in order to pierce the corporate veil and attach liability to the debtor individually, the Court may consider whether the corporation was a sham or whether there was undercapitalization or a failure to maintain separate corporate records. *Refco, Inc. v. Farm Production Ass'n,* 844 F.2d 525, 529 (8th Cir.1988). Other factors courts may consider are failure to keep the corporation's finances separate from the individual's finances, payment of individual obligations by the corporation, promotion of fraud or illegality

by the corporation, or failure to follow corporate formalities. *Lakota Girl Scout Council v. Havey Fund–Raising Management,* 519 F.2d 634, 638 (8th Cir.1975) (cited in *Refco, supra* ). In Arkansas,

[t]he conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case. The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. *Humphries v. Bray,* 611 S.W.2d 791, 793 (Ark. App.1981) (citation omitted).