In the Matter of Edward George
ANDERSON, Debtor.

GENERAL MOTORS ACCEPTANCE
CORPORATION, Plaintiff,

v.

Edward G. ANDERSON, George Ledford,
Trustee in Bankruptcy, Defendants.

Bankruptcy No. 3–80–01249.
Adv. No. 3–80–0323.

United States Bankruptcy Court,
S. D. Ohio, W. D.

Oct. 15, 1980.

George Ledford, trustee, Englewood, Ohio.

Donald F. Harker, III, Christopher M. Hawk, Lloyd D. Cohen, Fredric L. Sinder, H. J. T. Herzog, Ira Rubin, Thomas Noland, James H. McGee, Dayton, Ohio, William F. Randolph, Miamisburg, Ohio, Charles A. Johnson, Dayton, Ohio, John W. Rudduck, Wilmington, Ohio, Bobby Joe Cox, John Petzold, John R. Doll, Charles Ross, Dayton, Ohio, for defendants.

Daniel Nagle, Dayton, Ohio, for plaintiff.

## DECISION AND ORDER

### FINDINGS OF FACT

CHARLES A. ANDERSON, Bankruptcy Judge.

On 5 May 1980 Edward George Anderson filed a petition under Chapter 13.

This matter is before the court on a complaint filed on 18 June 1980 by General Motors Acceptance Corporation; a pretrial report and order entered on 25 September 1980, waiving further pleadings; the documentary evidence; and the facts incorporated into the pretrial order, as follows:

(a) The Debtor is the owner of a 1973 Oldsmobile 88 motor vehicle.

(b) The vehicle had a fair market value of $638.00 at the time of the filing of the Debtor's Chapter 13 petition on May 5, 1980.

(c) Plaintiff, General Motors Acceptance Corporation (GMAC) has a perfected security interest in the Debtor's 1973 Oldsmobile 88, dated 30 January 1980, in the original deferred payment amount of $1,471.81. The "annual percentage rate" is 17.2%. The monthly payments are $104.88 in twelve installments, commencing 10 March 1980.

(d) The payoff of the Debtor's obligation to GMAC was $1,106.25 on May 5, 1980.

(e) The gross outstanding balance owed by the Debtor to GMAC on May 5, 1980, was $1,150.56.

(f) The Debtor proposes to pay to the Trustee $150.00 per month for 36 months, or a base amount of $5,400.00.

(g) The Debtor has the following scheduled secured debts:

(1) CIT · carpeting and furniture . . . $800.00

(2) Household Finance Corp. household goods . . . . . . . . . $1,400.00

(3) GMAC 1973 Oldsmobile 88 . . . $1,106.23

(h) The Debtor has a real estate mortgage arrearage of $247.52 which will be paid through the Plan to cure the mortgage default.

(i) The Debtor has scheduled unsecured debts of $2,050.00

(j) The Plan proposes payments to CIT of $22.22 per month.

(k) The Debtor has avoided without contest the fixing of the lien of Household Finance Corp., pursuant to 11 U.S.C. § 522(f) and their claim is being treated as an unsecured claim.

(*l*) The Plan proposes to pay the secured portion of the GMAC claim at $16.66 per month. The Debtor herein modified the original Plan to pay GMAC $638.00 prior to payment of any dividend to unsecured creditors. The balance of the GMAC debt will be treated as an unsecured claim.

(m) The Debtor has an income tax refund due of $550.00 and the Ohio exemptions of 2329.66(A)(4)(a) and (A)(17) ORC have been claimed for the entire fund.

(n) The Debtor is the sole owner of his residence real estate which has a present market value of $30,000.00 and is encumbered by a mortgage of $24,360.00 to North Central Financial Corporation. The Debtor has claimed the Ohio exemption of $5,000.00 in the real estate pursuant to 2329[.66](A)(1) ORC.

(o) The Debtor has claimed the Ohio exemption of $1,500.00 pursuant to 2329.-66(A)(4)(b) on his household goods. The household goods have a present market value of $1,700.00 and the Debtor herein claims the balance of the household goods to be exempt by applying the unused portion of $250.00 of the Ohio exemption of 2329[.66](A)(17) ORC to this property.

(p) A straight liquidation by bankruptcy, Chapter 7, would result in a potential maximum dividend of $640.00 to the unsecured creditors, that being the non–exempt portion of the Debtor's interest in his real estate (note: the debtor's equity is assumed to be practically non–existent, however, because of mortgage deficiencies).

(q) The distribution of the Debtor's payments to the Plan would be as follows:

ATTORNEY FEE AND ADMINISTRATIVE EXPENSE . . . . . . . $ 810.00
CIT (SECURED CLAIM) . . . . . . . . $ 810.00
NORTH CENTRAL FINANCIAL CORP. (MORTGAGE ARREARAGE) . . . . . . . . . . . . . $ 247.52
GMAC . . . . . . . . . . . . . . . . . . . . . . $ 638.00
TO UNSECURED CLAIMS . . . . . . $2804.48
TOTAL PROPOSED PAYMENTS . . . . . . . . . . . . $5400.00

Debtor entered into an installment sales contract with Frank Z Chevrolet Company. The total purchase price for the vehicle was $1,201.75 on 30 January 1980, with a cash down payment of $213.25. To the net balance of $988.50, charges were then added for property damage insurance ($107.00), life and health and accident insurance ($39.01), finance charge ($112.55) and title and miscellaneous fees ($11.50), totalling $1,258.56. The "deferred payment price" was computed at $1,471.81. The total of payments was 12 installments of $104.88 each, commencing on 10 March 1980. The contract was assigned on 30 January 1980 to General Motors Acceptance Corporation.

The Debtor does not reside where public transportation is available for his employment and other daily needs, and the loss thereof would jeopardize his income.

The Plan now before the court does propose to modify the amount of the monthly payments to GMAC and, by reducing them, to extend the deferred payments beyond the contract term which ends 10 March 1981.

Debtor has a net take–home income each month in the amount of $879.82 plus a credit union deduction in the amount of

$227.90. The estimated future monthly income over estimated future expenses is in the amount of $174.70, most of which ($150.00) is to be paid to the Trustee for distribution to payments under the Plan.

There is no question raised as to whether the depreciation of the collateral from ordinary wear and tear would ever exceed the balance secured so that the creditor would never be inadequately protected by the lien retained under the Plan.

I

At first blush, it would appear that pertinent statutory provisions controlling this case seem ambiguous and inconsistent. Such is not necessarily so. The intent of the Congress can be perceived and implemented in specific cases, and applied without violating constitutional principles.

The rights of creditors are not involved to any greater extent in a Chapter 13 debt adjustment case than in an ordinary bankruptcy case. *Continental Illinois National Bank & Trust Co. v. Chicago, R.I. & P.R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110.* The adjustment of debts against a wage earner whose assets have depreciated in value or are inadequate (including future wages) to pay creditors timely does not deprive creditors of any property by reducing claims to their true value. *See Campbell v. Alleghany Corp., 75 F.2d 947 (4th Cir.) cert. denied, 296 U.S. 581, 56 S.Ct. 92, 80 L.Ed. 411.*

The Constitutional grant of power to Congress to legislate on the subject of bankruptcies has long been considered the power to impair the obligations of contracts for an overriding purpose. *Hanover Nat. Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113.* As discussed by this Court in *Rutherford v. Associates Financial Services (Bkrtcy.1980) 4 B.R. 510,* this power to impair contracts cannot be deemed a nullity or fiction by assuming it is *ipso facto* a denial of due process. Chapter 13 is another example of a proceeding which affects the remedy for a justifiable purpose, rather than causes a deprivation of vested property rights. *Wright v. Vinton Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455; 9 Am.Jur.2d Bankruptcy §§ 7–8.*

Before confronting the operation and effect of the statute and legislative history pertaining to those sections of the Bankruptcy Code of 1978 (the Code) pertinent to the instant controversy, we feel constrained to direct attention briefly to antecedent principles, without exhaustive discussion, which reflect upon uncertainties pertaining to the rights of debtors, secured creditors and unsecured creditors under Chapter 13. This chapter provides rehabilitation relief by "Adjustment of Debts of an Individual with Regular Income", superseding Chapter XIII ("Wage Earners' Plan") of the Bankruptcy Act.

Without laboring the point, it is important to recall that before a plan could be confirmed under § 652 of the Act, it must have been accepted by a majority of the unsecured creditors affected and by each secured creditor whose claim was "dealt with" by the plan. Considerable dialogue developed as to creditors claiming to be secured for the total amount of debts even though the collateral claimed might be worthless or only of nominal value compared to the amount claimed.

In order to avoid this artificial life and death power over such rehabilitation efforts by creditors secured in name only, The Supreme Court as of 1 October 1973 adopted Rule 13–307(d) designed to provide a procedure for determination of the extent any claim was secured and the extent it was unsecured. Rule 13–202(c) provided that the creditor would be entitled to reject as secured, but only to the extent as so determined.

Under Chapter XIII Plans (under the Act) nominal interest was often proposed by debtors for the secured portion of the claim so that an automatic rejection would not be filed to stifle the proceedings and precipitate additional legal expenses which typical debtors could not afford. Chapter XIII under the Act was used by attorneys for debtors very sparingly in those jurisdic-

tions following the aberrant rule of *In re Pappas, 216 F.Supp. 819 (S.D.Ohio 1962)*, because all secured creditors were deemed "dealt with" even though excluded from the Plan. In these jurisdictions, no Plan could be confirmed if secured creditors were not paid both principal and interest on both the secured and the unsecured portion. Furthermore, under this practice, some secured creditors would demand and receive interest and others would be treated differently.

Pursuant to the long established rule of *Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911)*, interest stops at bankruptcy unless the collateral of a secured creditor is adequate to cover both principal and interest, and a secured creditor whose security is inadequate to cover even the principal debt is entitled to no postpetition interest on any part of his claim. *See Annot: 9 Am.Jur.2d Bankruptcy §§ 483, 489 and 490* for more exhaustive commentary on postbankruptcy interest. This principle is one of procedure for liquidation of insolvent estates rather than substantive law.

These basic principles are important in the sense that the Bankruptcy Code has now made them a matter of statutory effect, in both liquidation and debtor rehabilitation proceedings, in obvious light of the decisions in *New York v. Saper, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710; United States v. Edens et al., 342 U.S. 912, 72 S.Ct. 357, 96 L.Ed. 682* (corporate reorganization); *United States v. General Engineering & Mfg. Co., 342 U.S. 912, 72 S.Ct. 358, 96 L.Ed. 682* (arrangement proceedings); *Columbia Aircraft Co. v. United States, D.C., 163 F.Supp. 932.*

## II

This sketchy background leads to the examination of the treatment of these problems considered during the legislative process and leading to codification of these principles and solutions in the Bankruptcy Code, as applied to the instant litigation.

This case is one of numerous pending cases raising the same issues which have been joined for the purpose of decision.

Rather than combine the cases and thereby necessitate multifarious findings of fact, the attorneys have proposed a presentment of their arguments herein as a test case, reserving the right to raise other issues in other cases as to distinctive facts. In all of these numerous cases, General Motors Acceptance Corporation (GMAC) is listed as a secured creditor, and duly filed proofs of claim rejecting the plan of the debtor and concurrently filed its complaint to recover possession of the collateral, to object to confirmation of the plan, or for a termination of the automatic stay.

The Plaintiff agreed to defer the trial on all issues other than the resolution of the Plaintiff's (GMAC) request for relief on issues specifically posed, as follows:

1. Is Plaintiff entitled to interest on its secured claim?

2. If the Plaintiff is entitled to interest on its allowed secured claim, how is that interest (present value) determined?

In the pretrial order, as endorsed by all parties, the issues were stated slightly differently, as follows:

(a) Plaintiff claims that it is entitled to the present value of its secured claim, to-wit: the value of its secured claim, to-wit: the value of the secured chattel, plus interest thereon.

(b) Defendant claims that interest is not to be paid by the Trustee on a secured claim.

Looking to the brief of Plaintiff, it is there urged that interest must be paid on its allowed secured claim under 11 U.S.C. § 1325(a)(5)(B)(ii) by ascertaining the present value of the collateral "and then capitalize deferred payments by converting the deferred payments to be distributed under the Plan into an equivalent capital sum as of the effective date of the Plan." To support this contention a quotation from *5 Collier on Bankruptcy ¶ 1325.01 at 1326–26 (15th ed. 1979)* is cited, together with the decisions in *General Motors Acceptance Corporation v. Lum, 5 B.C.D. 1039, 1 B.R. 186 (Bkrtcy.)* (using a time–value theory by

referring to Chapter 11, a 10% per annum interest rate was allowed based upon Tennessee law); *In re Ziegler, 6 B.C.D. 194, 6 B.R. 3 (Bkrtcy. Ohio 1980)* (which allowed a "discount rate" of 12% per annum computed under the technique of the Internal Revenue Code, *26 U.S.C. § 6621*, following a rationale similar to the *Lum* case); and *In re Smith, 6 B.C.D. 424, 4 B.R. 12 (Bkrtcy. E.D.N.Y.1980)* (which allowed a "discount rate" equivalent to the contract rate). After citing these authorities in the argument, the Plaintiff then urges that the interest rate on its claim herein should be raised to 18%, the maximum permitted under Ohio Revised Code § 1317.06.

On behalf of Debtor, it is countered that the original contract no longer exists, and if the Ohio statutes are to be employed to fix a rate of interest, it would not be under the small loan installment rate (as did Plaintiff) but, rather, the statutory rate "for matters where the rate of interest is unspecified", (that is, six percent).

An *amicus–curiae* brief submitted on behalf of a debtor similarly involved in another case also urges that no interest rate is mandated under 11 U.S.C. § 506(b) and 11 U.S.C. § 1325(a)(5)(B)(ii) if the value of the claim is only equal to or less than the value of the collateral; but, if interest is to be set by the court, the rate should be the 6% legal rate on judgments under Ohio Revised Code § 1343.03 (citing *In re Crockett, 3 B.R. 365 (Bkrtcy. N.D.Ill.)* and *In re Williams, 6 B.C.D. 237, 3 B.R. 728 (Bkrtcy.)* for rationale).

The Chapter 13 Trustee by memorandum citing the same decisions as mentioned previously urges that, "In the absence of some legislative action at the federal level, the interest rate question may be one of those matters of local law which will never be reduced to general principals [sic]."

### III

This court cannot necessarily subscribe to the conclusions drawn in the quotation from *Collier* and the well reasoned decisions cited by the briefs *supra*. The statute does not use the time–value discount so clearly as to preempt the entire gloss of case precedents from preceding rehabilitation statutes especially Chapter X of the Act. Likewise, the legislative history so readily referred to in those citations is not so conclusive.

The original focus to determine whether a secured creditor is to be paid interest on its secured claim is first to the Plan itself, as filed. Under 11 U.S.C. § 1321, only the debtor may propose a Plan. The Court and the secured creditor, therefore, do not propose or establish any interest rate other than a rate as contained in the Plan. Hence, the answer may be "yes", "no", "perhaps", and in most instances "probably", to the question of whether interest is to be paid to a secured creditor.

A plan, among other features, may modify the rights of holders of secured claims other than a claim secured only by a security interest in real property that is the debtor's principal residence. *11 U.S.C. § 1322.* If the Plan is accepted by the holder of a secured claim, the court looks to the other mandatory requirements for confirmation. If the debtor keeps the collateral and the Plan provides that the holder who rejects retains the lien securing the claim, as in the instant case, then the focus turns first to the value of property to be distributed under the plan to such creditor to ascertain that it is not less than the allowed amount of the claim.

In the instant case we note that the security agreement held by the Plaintiff is not modified as to the consensual interest rate fixed by contract. Because of the original agreement between the parties, this is very likely a sensible choice as long as it does not conflict with current "discount rates". The function of a "discount rate", so frequently discussed, is its use as a monitor (negative) rather than as an affirmative requirement to be imposed by a court on the parties. A correct application of the discount rate and a present value analysis in connection with the fair and equitable test adopted by the 1978 Code is aptly described in the legislative history of 11 U.S.C. § 1129, as follows:

"Application of the test under subparagraph (A) also requires a valuation of the consideration "as of the effective date of the plan". This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest to be paid is equivalent to the discount rate used, the present value and face future value will be identical. On the other hand, if no interest is proposed to be paid, the present value will be less than the face future value. For example, consider an allowed secured claim of $1,000.00 in a class by itself. One plan could propose to pay $1,000.00 on account of this claim as of the effective date of the plan. Another plan could propose to give a note with a $1,000.00 face amount due five years after the effective date of the plan on account of this claim. A third plan could propose to give a note in a face amount of $1,000.00 due five years from the effective date of the plan plus six percent annual interest commencing on the effective date of the plan on account of this claim.... *Whether the third plan complies with subparagraph (A) depends on whether the discount rate is less than six percent. Normally the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments.*" [emphasis added].

The second Plan in the examples which is a five year extension *bearing no interest rate*, would never exceed the allowed amount of the secured claim. It is, therefore, specifically cited to be in compliance with the statutory value analysis (a negative factor not a positive add–on). [emphasis added].

House Report No. 95–595, 95th Cong., 1st Sess. 412 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6368.

The fair and equitable rule running through all reorganization or rehabilitation proceedings is controlling as to Chapter 13 secured claim holders and debtors, as well as the unsecured, when the focus falls on impaired unsecured claims. The authorities cited by the parties would appear to overlook the unsecured creditors even though the facts support the best interest of creditors test of 11 U.S.C. § 1325(a)(4). The court must look to all classes of creditors, not just to the secured claims and to the value of property retained by the debtor.

Looking to 11 U.S.C. § 506(a), the claim of a creditor holding a lien secured by the debtor's property is divided into secured and unsecured portions if the collateral is valued less than the face amount of the claim, as in the present case. The claim, therefore, is divided into an allowed secured claim, which is equal to the value of the collateral, and an allowed unsecured claim for the deficiency. This follows § 57(b) of the Bankruptcy Act and Bankruptcy Rule 306(d), often followed prior to the 1978 Bankruptcy Code.

■ Only to the extent that an allowed secured claim is secured by property of a value greater than the amount of such claim is the holder allowed unearned interest, fees and costs. As mentioned previously, this is not a new principle adopted by the Code.

We must conclude, therefore, that the traditional rule barring postpetition interest has not been changed by the Bankruptcy Code. Likewise, interest is not allowable unless the value of the collateral exceeds the value of the claim, and unmatured interest is disallowed. The lien nevertheless, is not invalidated, and is security for both principal and earned interest.

If the property of the estate not subject to a lien (future earnings) is applied to the payment of interest on a secured claim accruing after the filing of a petition, the claims of the impaired unsecured class are defeated by diversion of unsecured assets to a secured class despite the prohibition of traditional bankruptcy law and despite the express dictates of 11 U.S.C. § 502(b). So diverting this unencumbered property of the estate from unsecured claims to secured classes discriminates against unsecured claims and is not fair and equitable to the holders of unsecured claims.

Conversely, in any case wherein estate property contained unencumbered, non–exempt assets in excess of the value of secured claims, then it might not meet the best interests test as to unsecured creditors and could not be confirmed under 11 U.S.C. § 1325(a)(4). A court must, therefore, balance these two requirements in a debt adjustment case.

This rationale does not lead to court imposed modifications of Chapter 13 plans by some magical "discount" payments. Nor does it necessarily lead to a time–value economic theory because of deferred payments. All of the classes of creditors are delayed in receiving the value of their claims, including the unsecured. The intention of the Congress has been very clearly expressed in the very title of Chapter 13; namely, "Adjustment of Debts of an Individual With Regular Income." Hence, all debts must undergo a fair and equitable adjustment, and no class of creditors can be unfairly discriminated against.

The provisions of 11 U.S.C. § 506(a) are controlling in effecting this "adjustment" sought by the Bankruptcy Code, which reads in pertinent part, as follows:

(a) allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim *to the extent of the value of such creditor's interest in the estate's interest* in such property. . . . *Such value shall be determined in light of the purpose of the valuation* and of the proposed disposition or use of such property, *and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest* [emphasis added].

■ Under the facts of this case, the value of the collateral is not greater than the amount of the claim of Plaintiff and would, therefore, not be entitled to interest by the express provisions of 11 U.S.C. § 506(b) in an immediate liquidation proceedings.

### IV

Applying the valuation provisions to the facts and recognizing that the lien of Plain-

tiff secured both principal and earned interest, the interest on the determined valuation of the 1973 Oldsmobile ($638.00) upon the effective date of the Plan must be accrued during the period of the extension. The monthly payments received by Plaintiff must then be applied to the combined principal and interest. The unsecured portion of Plaintiff's claim must be paid pro rata with the unsecured class, into which it is placed, without accruing interest.

After the expiration of the 36–month extension, the accrued but unpaid interest charged to the secured portion of the Plaintiff's claim remains a lien on the 1973 Oldsmobile if the indubitable equivalent has not been received to the extent of any current or appreciated value at that time. If there is any excess value (similar to appreciation in a Chapter 11 Reorganization case) the lien for interest on the secured portion must be paid to the extent of the unrecovered value, assuming first that the amount of dividends paid to the unsecured portion of the claim does not compensate for the indubitable equivalent of principal and unpaid interest. Otherwise, the excess value accruing to the Debtor would render the Plan not fair and equitable to Plaintiff.

In addition to protecting the secured party's lien for both principal and interest to the extent of the value of the collateral, a valuation may always be employed to monitor the adequate protection afforded under 11 U.S.C. § 361 so that the value remains the indubitable equivalent of the secured creditor's interest in such property. So long as the lien retained is in effect, the secured creditor may assert any excess values or conversely, any lack of protection.

The question of value may be raised at any time in a debt adjustment case, "in light of the purpose of the valuation and of the proposed disposition or use of such property . . . . or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). Such is the significance of the valuation provisions and the lien retention provision.

Since the Congress clearly intended to remove capricious "life and death" rejection

control by secured creditors over attempts by debtors to effect debt adjustment plans, it would appear axiomatic that a new fictitious "discount rate" was not intended as a substitute device to stifle the rights of debtors and unsecured creditors to a fair and equitable procedure. Likewise, it seems equally incongruous that debtors can now exploit such debt adjustment procedures to obtain a windfall while enjoying the use of property the debtors acquired by borrowing subject to consensual liens. It seems more reasonable to conclude that the Congress seriously weighed debt adjustments within the parameters of the constitutional right of a secured creditor not to be deprived of property without due process, giving rise to express lien retention as security for both principal and interest.

## V

In summary, the function of the Bankruptcy Court is to determine whether or not a proposed plan under Chapter 13 should be confirmed as a debt adjustment in the best interest of unsecured creditors, feasible for the debtor, and bearing constitutional and statutory muster as to the vested property rights of secured creditors. The courts neither propose Plans nor modify them. The confirmation of even a fair and equitable plan, weighing all of the conflicting interests, will seldom, if ever, seem entirely satisfactory to all or any separate classes. Economic realities on debt adjustments might frequently dictate to the unsecured claimants an immediate bad debt loss, rather than an extension for insignificant amounts of return. Hence the so—called "cram down" necessary in such cases is not the lot of secured claims only.

In final analysis, the basic legal and economic problems under a Chapter 13 adjustment of debts are not different from those in a liquidation bankruptcy (or even a business reorganization case). The court jurisdiction and procedures provide the element of additional time to maximize the potential future earnings of the debtor in effecting a relief from a burdensome and impossible debt structure affecting earning capacity

and family existence. The situation demands either an immediate discharge in bankruptcy or a delayed discharge. In effect, the debtor seeks time to effect the same results as a reaffirmation (not unlike that under 11 U.S.C. § 524) or as a redemption (not unlike that under 11 U.S.C. § 722).

Hence, this Court cannot read the applicable sections of the Bankruptcy Code as mandating an arbitrary "discount" rate to be imposed by judicial fiat on all debtors. If the Congress intended so to legislate, the statutes might well have so provided. By the same token, the Congress certainly did not contemplate deprivation of vested property rights contrary to case precedents and constitutional principles. Hence, this Court is constrained to admonish the debtor that he cannot expect to deprive the secured creditors of vested property rights without paying a reasonable financial return on the investment.

If the future income of a debtor does not render such realities as feasible, the court should permit the liquidation of the burdensome property, either by court procedures or by sale procedures under state law available to the lien holder to the benefit of both debtor and secured claim holder.

Conversely, if the debtor's plan offers a reasonable financial return to the secured claimants based upon the valuation of the collateral pursuant to 11 U.S.C. § 506 (and the best interests test and fair and equitable requirements are met), the Chapter 13 provisions are a legal procedure well designed to prevent any of the affected and impaired parties from arbitrarily and capriciously defeating the interests of other parties of classes by means of an extended composition or debt adjustment such as experienced under the superseded Chapter XIII of the Bankruptcy Act. The reasonable financial return may well be met by combining the priority payments to the secured claim with the percentage quantum, received by the same creditor as dividends on the unsecured portion of its claim, thereby effecting the semantical "indubitable equivalence" contemplated by Judge Learned Hand in *In re Murel Holding Co., 75 F.2d 941 (2d Cir. 1935) at p. 942.*

The indubitable equivalent concept is more than a mere literary embellishment. It has been adopted by the Code in 11 U.S.C. §§ 361 (adequate protection), 362 (automatic stay), 363 (use, sale or lease of property), and in 11 U.S.C. 1129(b)(2)(A)(iii). *See 124 Cong.Rec. H 11104 (September 28, 1978).*

If the cash payments actually made never total ·the amount of the allowed secured claim, the Plaintiff must be afforded the opportunity to look to the collateral to realize the indubitable equivalent from a future evaluation to show any residue or increase in value not contemplated on the effective date of the Plan. In the event of a subsequent default in payments under the Plan from the unsecured portion of the amount of deferred payments as a "substitute of the most indubitable equivalence" for earned finance (debt service) charges the claim must be adequately protected by the lien retention. *See 124 Cong.Rec. H 11104 (September 28, 1978).* To this extent only a partially secured creditor has protection against appraisal and sale or default on the unsecured payments provided in the Plan as are provided in Chapter 11 under U.S.C. § 1111(b).

■ The answer to ,the first question posed by the briefs, therefore, is that an extension for payment of the secured claims often would dictate some debt service charge, usually computed as an interest rate. If an interest rate is proposed, the court must determine whether such rate is prejudicial to the interests of other claims or classes of creditors. The reasonableness of the rate and the financial return, however, would often turn on the amounts to be received by a secured claimant on the unsecured portion of the claim.

■ If the rate proposes to pay a secured claim (in addition to the valuation of the collateral) finance charges greater than current market or "discount rates", confirmation of the plan would be denied. If the rate proposed is less than the consensual contract finance charge, the court must determine that the rate is reasonable in light of the particular facts; such as: the type of

collateral involved; the likelihood of appreciation or depreciation in value; the immediate liquidation potential; the motivation or purpose of the secured claimant in not cooperating in a debt adjustment; the length of the proposed extension compared to the termination rate of the original contract between the parties; and, the percentage amounts of the dividends to be paid also to unsecured claims (including the unsecured portion of· secured creditors' claims). Again adverting to reaffirmations and redemptions, the most acceptable and feasible rate to be proposed by a debtor would approximate the consensual contract rate, assuming it was in fact a reasonable consensual rate and not imposed by the lender to exploit a naive, unsophisticated debtor or a debtor in desperation. Any reasonable proposal would be far more· advantageous to all parties than capricious litigation.

### VI

■ Based upon the foregoing rationale, applied to the facts *instanter*, the following findings and conclusions are reached, namely:

1. Since the debtor's plan does not propose to modify the consensual interest rate, Plaintiff in effect is offered the same financial return on the value of its claim as the security agreement (17.2% A.P.R.) which for the present purposes should be converted to simple actuarial interest of 9.82 percentum per annum, for the term of the extension.

2. The value of the collateral is $638.00, and the Plaintiff retains a lien securing its claim. The balance due on the debt in the amount of $568.23 is allowed as an unsecured claim, and added to that class.

3. The lien retained by Plaintiff secures both principal and a earned interest (finance charge) on the value of the collateral until the claim is paid or the value of the collateral has been consumed, whichever is the earlier.

The depreciation rate of the collateral would not exceed the balance due at any time during the course of the plan extension and the Plaintiff also receives adequate protection for its lien.

4. The unsecured portion of Plaintiff's claim bears no interest, and will be paid pro rata dividends with the other unsecured claims.

5. Since the allowed secured claim of Plaintiff is secured by property the value of which is less than the amount of the claim, interest allowed to the holder on the claim shall not be deducted from the other property in the estate (including future earnings) to diminish and prejudice the Plan distributions to the unsecured creditors class.

6. Since the Plan payments of $16.66 per month to the Plaintiff's secured claim compute out to only the approximate amount of $600.00 over the projected 36 months, both the principal and earned interest will not have been paid by that time. If the dividends on the unsecured portion do not effect the indubitable equivalence, the property subject to the lien of Plaintiff shall be reappraised, or the valuation otherwise resolved, as soon as the Trustee has completed all payments under the Plan and the lien shall be retained to the extent of the valuation on that date, if any, which must be paid by the debtor in cash or by a modification of his plan to assure recovery of the indubitable equivalent of the value (unless the debtor and Plaintiff as secured claim holder can agree to a consensual valuation). All requested appraisals by the secured claim holder must be deducted from the accumulated interest and not from the portion of the distributions allocated to the unsecured class of creditors. The absolute priority principle does not apply to require invasion of the future earnings because this part of the estate is unsecured.

7. Since the combined total of the monthly payments to Plaintiff of $16.66 each, which must be applied to both principal and interest earned during the extension, plus the dividends paid on the unsecured portion, will exceed the earned interest not paid in the monthly payments, the indubitable equivalent of the value will have been paid to Plaintiff in 36 months. Hence, the retained lien for principal and earned interest will have been paid, and there will remain no purpose in a revaluation of the collateral to establish any balance to be paid by the debtor on the retained lien for him to keep his automobile as unencumbered, or to require the Debtor to surrender possession and jeopardize his employment or family transportation.

*ORDERED, ADJUDGED AND DECREED,* that the Plan should be and is hereby confirmed, and the prayers of the complaint seeking either delivery of the collateral to Plaintiff or for relief from the stay imposed by 11 U.S.C. § 362(e) are denied.

*ORDERED, ADJUDGED, AND DECREED,* that as soon as the Plaintiff has received the combined principal and finance charge (computed as interest) earned during the period of the extension from the monthly payments as secured claimant and from dividends on the unsecured portion of the debt, the retained lien shall be deemed released and the collateral need not be reappraised for excess value or appreciation.