**In re ALL–BRITE SIGN SERVICE CO., INC. a/k/a All-Brite Sign Service, Inc., and All-Brite Electric, Debtor.**

**CITIZENS FIDELITY BANK & TRUST CO., Plaintiff,**

v.

**ALL–BRITE SIGN SERVICE CO., INC., Defendant.**

**Bankruptcy No. 3–80–00328.**
**Adv. No. 3–80–0258.**

United States Bankruptcy Court, W. D. Kentucky.

May 29, 1981.

Kenneth H. Baker, Louisville, Ky., for plaintiff.

Thomas V. Haile, Louisville, Ky., for defendant.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This matter has arisen on complaint of plaintiff, Citizens Fidelity Bank and Trust Company (hereafter the bank) to lift the automatic stay on funds in the general account of the defendant, All-Brite Sign Service Company, Inc. (hereafter All-Brite), so the bank may use those funds to set off All-Brite's outstanding obligations as permitted by 11 U.S.C. § 553.

At issue is the relationship between two debts, one unsecured, the other purportedly secured, and two deposits, one made shortly before the petition in bankruptcy was filed, and the other after. The facts, briefly stated, follow.

On August 31, 1977, All-Brite executed a promissory note in the amount of $7,500, payable within 90 days to the Citizens Fidelity Bank, marking the beginning of a course of dealing that lasted until All-Brite filed bankruptcy over two years later. On the same day, All-Brite gave the bank a security interest in their accounts and contract rights and subsequently obtained proceeds. The security agreement which evidenced the bank's security interest defined accounts as "any and all accounts of the debtor now existing or hereafter arising and whenever and wherever acquired (including, but not limited to, the specific accounts listed on the attached schedule)". The only account scheduled at that time was that of the Bank of Louisville. On December 16, 1977, the bank filed a financing statement covering all presently existing and after-acquired accounts receivable and contract rights and their proceeds in the Jefferson County Clerk's office.[1]

Thereafter, at 90-day intervals, each note would be cancelled upon the execution of a new note. The reissued and reestablished obligation listed as security collateral "previously pledged", an apparent reference to the original security agreement and financing statement. Through this method of contemporaneous cancellation and execution of notes, eleven of twelve notes were retired. The twelfth, for $6,500, was executed on January 21, 1980 and, because the bankruptcy petition was filed on February 7, 1980, remains outstanding.

A similar course of dealing took place with regard to an unsecured obligation. On September 17, 1979, All-Brite signed an

---

1. Why the financing statement was not filed until three and one-half months after the note and security agreement were executed is not clear, but the delay in filing has no effect on the validity of the bank's security interest vis-a-vis the trustee.

unsecured promissory note, payable in 90 days, for the amount of $4,000. The obligation was cancelled and a new 90-day note for $4,000 was issued on December 17, 1979. That note is also unpaid.

Late in the afternoon of February 6, 1980, All-Brite deposited into its checking account with the bank checks from the sale of corporate assets totalling $6,175.54. Early the next morning, All-Brite filed bankruptcy. Sometime thereafter, though it is not clear when, All-Brite made a second deposit, made up of collections of accounts receivable, in the amount of $6,013.35.

The bank is now seeking removal of the automatic stay so it can apply the money it holds in All-Brite's account to All-Brite's total outstanding indebtedness of $10,500.

The arguments of the parties present two fundamental questions: (1) whether a deposit of *checks* made the day before a petition in bankruptcy is filed is subject to set off by the depositary bank, and (2) whether the depositary bank may retain a post-petition deposit of proceeds of accounts receivable in which a security interest is claimed.

▮ Before addressing those issues, however, we need to deal with the subsidiary question, faintly raised by the debtor, of whether the execution of the notes within 90 days of the bankruptcy constituted preferential transfers. We submit that the answer can be found in Collier's, "It is well settled that it is not the mere giving of a note by the debtor to his creditor, but rather how the payment thereof within the 90-day period effects the preference".[2]

The cancellation of one note by the execution of a new one within 90 days before bankruptcy does not result in a preference.[3]

The question regarding the prebankruptcy deposit arises out of All-Brite's contention that when bankruptcy intervenes between the deposit and collection of checks, setoff is not permitted.

▮ Two related principles of law underpin this assertion. First, the general rule in bankruptcy law is that the filing of the petition represents the time of cleavage, after which sums deposited with a bank may not be set off against the debtor's indebtedness to that bank.[4] The Sixth Circuit Court of Appeals, in cases which originated in this district, has adopted that approach.[5]

The rule reflects application to bankruptcy of that general principle of law which limits use of setoff to cases where mutual debts exist at the time setoff is attempted. The filing of the petition marks the time at which mutuality ceases,[6] and any money thereafter deposited is considered either property of the debtor or his estate.[7] This is embodied in 11 U.S.C. § 553(a), which permits setoff in bankruptcy, only for mutual debts "that arose before the commencement of the case".

As applied to these facts, the question of mutual indebtedness turns on a bank's status upon and shortly after receipt of its customer's deposit of checks. A *cash* deposit in a general account immediately establishes a debtor-creditor relationship.[8] The money merges instantly into the bank's

---

**2.** 4 *Collier on Bankruptcy,* ¶ 547.15, at 547–50 (15th Ed. 1979).

**3.** *Dogget v. Chelsea Trust Co.,* 73 F.2d 614 (1st Cir. 1934); *Blue v. Herkimer Nat. Bank,* 37 F.2d 663 (2nd Cir. 1930), cert. denied 281 U.S. 750, 50 S.Ct. 354, 74 L.Ed. 1162.

**4.** *Toof v. City National Bank,* 206 F. 250 (6th Cir. 1913); *Citizens' Union National Bank v. Johnson,* 286 F. 527 (6th Cir. 1923); *In re Merchandise Mart of Columbia,* 79 F.Supp. 686 (E.D.S.C.1948); *In re Susquehanna Chemical Corp.,* 81 F.Supp. 1 (W.D.Pa.1948), aff'd, 174 F.2d 783 (3rd Cir. 1949); 4 *Collier on Bankruptcy,* ¶ 553.15[4], at 553–70 (15th Ed. 1979).

**5.** Id. *Toof* and *Citizens' Union National Bank.*

**6.** *In re Michaelis & Lindeman,* 196 F. 718 (D.C. N.Y.1912); *In re Susquehanna Chemical Corp.,* supra note 4.

**7.** 11 U.S.C. § 541(a) and § 542(b).

**8.** See *New York County National Bank v. Massey,* 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904) and *First National Bank of Clinton v. Julian,* 383 F.2d 329 (8th Cir. 1967).

general fund, to be used for whatever purpose it might choose, subject only to its depositor's right to have the debt repaid by honoring checks drawn against the deposits.[9] Less certain is whether a bank likewise becomes indebted when *checks* are deposited.

All-Brite relies on *Moore v. Third National Bank*,[10] in which a deposit of checks was found to be different from a deposit of money, and could not be set off where the proceeds were obtained after the petition was filed.

*Moore* does not, however, address the underlying question of what status a bank in which checks are deposited, but not cleared, enjoys. In *Kane v. First National Bank of El Paso*,[11] the court found that under those circumstances a bank "was only the agent for the depositor, who remained the owner until by actual collection the bank became liable to the depositor as for a general deposit, the proceeds becoming at the same moment the property of the bank".[12] The entries of credit made at the time of deposit were considered by the court "mere memorandums until substantiated by collection" which "had no effect except to declare what the bank intended to do when it should collect the checks".[13]

A different result was reached in *Matter of Crystal Bros.*,[14]—a case more factually similar to this one than *Kane*—where the Court held that once credit was given, the bank became indebted to its depositor. The court permitted setoff against checks deposited one hour before bankruptcy was filed, reasoning as follows:

It would seem that *prima facie* the bank became indebted to bankrupt in the amount of checks deposited subject to a charge back in the event they were not found good. The books of the bank showed the credit at once; no charge backs were made.

While it might well be that what actually occurred in connection with the payment of these checks would alter my conclusions, I am inclined to believe that, in the present state of the evidence, I must find that when the credit was entered in favor of the bankrupt in the bank's books that constituted their relation as creditor and debtor unless shown to be otherwise.[15]

■ In light of the weight of authority, the conclusion reached in *Crystal Bros.* cannot now be relied upon. The viewpoint expounded in *Kane* more accurately reflects the prevailing rule of law—that a bank is presumed an agent of its depositor absent contrary evidence. This rule has been embraced by this federal district,[16] by the Sixth Circuit,[17] and by the Supreme Court;[18] and has since been codified in Section 4–201 of the Uniform Commercial Code.

Under Section 4–201 a bank is presumed an agent for a check's collection until the check is finally paid, and any credit given before final payment is merely provisional, subject to charge-back if the item is not cleared. The depositor of the check remains its owner until the bank's collection efforts are complete, at which time the relationship between bank and customer shifts from principal-agent to debtor-creditor. Paragraph 4 of the Official Comment to 4–201 best sums up the rule:

The depositary bank evidences the results of its collection by a "credit" in the

---

9. Id.

10. 41 Pa.Super. 497 (1910).

11. 56 F.2d 534 (5th Cir. 1932).

12. Id. at 537.

13. Id.

14. 11 Am.B.R. (N.S.) 311 (N.D.Ohio 1928), quoted in 4 *Collier on Bankruptcy*, ¶ 553.15[4] at 553–70 n. 33 (15th Ed. 1979).

15. Id.

16. *American Sugar Refining Co. v. Anderson*, 20 F.Supp. 55 (W.D.Ky.1937), aff'd, 107 F.2d 948 (6th Cir.).

17. *Keyes v. Paducah & I. R. Co.*, 61 F.2d 611, 614 (6th Cir. 1932).

18. *Jennings v. USF&G Co.*, 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869.

account of its customer. As used in these instances the term "credit" clearly indicates a debtor-creditor relationship. At some stage in the bank collection process the agency status of a collecting bank changes to that of debtor, a debtor of its customer ... [A]ll agency aspects are terminated and the identity of the item has become completely merged in bank accounts, that of the customer with the depository bank and that of one bank with another.

Application of this principle to setoff[19] would indicate that until the principal-agent relationship evolves into a debtor-creditor relationship mutual indebtedness, the linchpin of setoff, cannot exist.

The depositing of checks merely gives rise to the possibility that setoff might be exercised in the future. The credit which reflects the deposit, being provisional, is a bookkeeping entry only; no funds actually flow into the depositor's account until collection of the checks is complete, at which time the bank becomes indebted to its customer and the right to setoff fully matures.

Setoff in bankruptcy similarly would be affected. Section 553(a) of the Code preserves a creditor's right to setoff, but only for a "mutual debt owing by such creditor to the debtor that arose before the commencement of the case". Setoff of a bank account can only be effected to the extent that the account actually contains funds when the petition is filed. Setoff cannot be made against an account in which checks are deposited before bankruptcy, but not collected until after, because the critical element of mutuality of debt is simply not there.

For this reason, we cannot allow the Citizens Bank to set off All-Brite's debt with its pre-petition deposit. We fully realize that All-Brite acquiesced to the bank's right of setoff when it opened its account with the bank,[20] but that agreement merely acknowledged the use of setoff; it did not attempt to change those legal elements, such as mutuality of debt, which underlie it. The filing of bankruptcy marked the point in time at which the bank to avail itself of valid rights of setoff, had to be obligated to All-Brite. Nothing in the record rebuts the presumption that the bank took in the checks as an agent for their collection.[21]

Consequently, setoff may be exercised if, and only to the extent that, funds from the deposited checks were finally collected at the time of bankruptcy.

We will leave it to the bank to bring to our attention within 30 days after the date of this order any item for which final payment was received before bankruptcy. At the end of that time proceeds not so collected shall be turned over to the trustee.

The bank claims it is also entitled to retain All-Brite's postpetition deposit of checks. As we have said, postpetition deposits may not generally be set off.[22] Here, however, the bank claims it holds a security interest in All-Brite's second deposit of $6,013.35.

This argument hinges on whether the bank's security interest in All-Brite's accounts is properly perfected.

Section 9–302 of the Uniform Commercial Code requires the filing of a financing statement to perfect a security interest in

---

**19.** It is doubtful that 4–201 was enacted in anticipation of the precise issue with which we are now confronted being raised. But, because most problems that might arise relating to the bank's status are resolved elsewhere in Article 4, Section 4–201 is most particularly applicable to residual areas not covered by specific rules where status may be important. (See e. g. Official Comment to 4–201, paragraph 2.) So it is here.

**20.** Plaintiff's exhibit B is a copy of Citizens Bank's checking account rules paragraph 11 of which states: "We may at any time when due,

setoff and use funds in your account to pay any debt or any Authorized Signer may owe us".

**21.** We can think of very few instances where a bank would rather become the owner of a deposited check, and thereby incur a debt for its payment, than act as an agent for its collection. Agency status, with its concomitant right to charge back, usually heavily favors the bank in its dealings with customers. This case is a rare exception.

**22.** Supra, note 4.

accounts receivable. The bank so filed on December 16, 1977. Section 9–402 of the U.C.C. provides that "A financing statement may be filed before a security agreement is made or a security interest otherwise attaches". We thus find no problem with the continued applicability of the financing statement filed on December 16, 1977, to the last secured note executed on January 21, 1980.

■ All-Brite's principal challenge to the bank's security interest, however, is based on what it contends is the uncertainty of what property was actually pledged. Both the original security agreement and financing statement listed as collateral "all presently existing and after-acquired accounts and contract rights and any proceeds in them". At the time the first secured transaction was entered into, the only account specifically scheduled was one from the Bank of Louisville. Thereafter, upon the cancellation and reestablishing of each 90-day note, the collateral securing the obligation was described as that "previously pledged".

We think it fair to say that, in light of the course of dealing between the bank and All-Brite, and when read with the more complete description in the financing statement and original security statement, the description reasonably identified the covered collateral.[23] Therefore, although the Bank of Louisville account was the only one in existence when the bank's security interest was perfected, it was not the only account to which the bank's interest might attach.

■ The only limitation on the bank's ability to take a security interest in after-acquired accounts is that which was imposed by Section 552(a) of the Bankruptcy Code when All-Brite filed its petition. Section 552(a) precludes the fixing of a lien resulting from a pre-bankruptcy security agreement on property acquired after bank-

ruptcy, and thus renders ineffective after bankruptcy the operation of an after-acquired property clause in a security agreement.

Excepted from operation of this rule, however, are the proceeds of secured property. Under Section 552(b) proceeds from property acquired before bankruptcy are still subject to a prebankruptcy security interest in them. All-Brite's postpetition deposit of proceeds, unless derived from accounts acquired after bankruptcy, was therefore subject to the bank's security interest. The bank is entitled to apply those proceeds to All-Brite's outstanding secured indebtedness.

Upon the foregoing reasoning and authorities, and subject to the offer of such additional proof described in this opinion, it is hereby

ORDERED that the Citizens Fidelity Bank and Trust Company return to the debtor's estate the prebankruptcy deposit of $6,175.54.

IT IS FURTHER ORDERED that the bank be permitted to retain the account proceeds in its possession. This is a final order. Judgment shall be entered accordingly.

---

23. Section 9–110 of the U.C.C. provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described". A financing statement containing an adequate description of collateral may clarify a vague security agreement. *In re Nickerson & Nickerson, Inc.*, 329 F.Supp. 93 (D.Neb.1971), aff'd, 452 F.2d 56 (8th Cir. 1971).