In the Matter of WILLSON DAIRY COMPANY and Its Holiday Ice Cream Division, Debtor,

The CENTRAL TRUST COMPANY, N.A., Plaintiff,

v.

Milton E. BURCHETT, Trustee, Defendant,

and

Milton E. BURCHETT, Trustee, Plaintiff,

v.

The CENTRAL TRUST COMPANY, N.A., et al., Defendants.

Bankruptcy No. 1–81–01506.
Adv. Nos. 1–81–209, 1–81–210.

United States Bankruptcy Court, S.D. Ohio, W.D.

May 17, 1983.

Edmund Adams, Cincinnati, Ohio, for Central Trust Bank.

Bernard C. Fox, Cincinnati, Ohio, for Dairy Employees Union Pension and Welfare Trust Fund.

Milton E. Burchett, Arthur J. Schuh, Cincinnati, Ohio, for Milton E. Burchett, trustee.

FINDINGS OF FACT, OPINION AND
CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy
Judge.

These consolidated proceedings are before
the Court for disposition of a dispute in-
volving a major portion of the assets in this
Chapter 7 case. On June 1, 1981 an invol-
untary petition in bankruptcy was filed
against the debtor in this case, Willson
Dairy Company and its Holiday Ice Cream
Division. On July 1, 1981 Central Trust
Company, N.A. filed a complaint for recla-
mation of property encumbered by a num-
ber of security agreements between Willson
and Central Trust. A few hours later, the
trustee in this case filed a complaint seek-
ing to sell that same property free and clear
of liens, or in the alternative to require
Central Trust to marshal its assets. There-
after, the trustee filed a counterclaim to
Central Trust's complaint alleging that cer-
tain transactions between Central Trust
and Willson were voidable as preferential
and/or fraudulent transfers under 11 U.S.C.
§ 547 and 548.

The parties' claims were consolidated by
Order of July 9, 1981. On January 14, 1982
the trustees of the Milk and Ice Cream
Industry—Dairy Employees Union Pension
and Welfare Trust Funds were allowed to
intervene in the consolidated proceedings.

The Court conducted evidentiary hearings
in this case on March 5, 1982 and again on
November 19, 1982. Virtually all of the
facts relevant to this dispute were stipulat-
ed by the parties, and those stipulations are
hereby incorporated by reference into this
decision. The facts may be summarized as
follows: Prior to June of 1981 Willson
Dairy Company and its Holiday Ice Cream
Division were engaged in the manufacture
and distribution of an extensive line of milk
and dairy products.

In early 1973 the company established a
line of credit with Central Trust. From
March of 1973 until January of 1981 Willson
obtained a series of business loans from

Central Trust evidenced by promissory
notes executed by Willson. (See Stipula-
tions 2 and 11; Exhibits C through F and X
through EE, attached thereto).

With four exceptions[1], each of these
loans was secured by all of the inventory,
equipment, furniture, accounts receivable,
raw material, fixtures, work in process, and
real estate owned by Willson and its Holi-
day Ice Cream Division. (See Stipulations 6
& 7; Exhibits M through Q). By their
terms, these security agreements apply to
after-acquired property and future ad-
vances as is permitted by Ohio Revised
Code § 1309.15.

On May 1, 1978 Dale F. Grace, trustee
and sole stockholder of Willson executed an
absolute and unlimited guarantee of pay-
ment for all of Willson's loans to Central
Trust. (See Exhibit W attached to Stipula-
tions). On June 13, 1980 and March 11,
1981 Green Valley Stores, Inc., a corpora-
tion in which Dale F. Grace is the sole
stockholder, gave Central Trust a guarantee
of payment for Willson's loans limited to
and secured by certain real estate in Cler-
mont County, Ohio. (Exhibits S through V
attached to Stipulations). No evidence was
presented by any party regarding the ex-
tent to which Green Valley's real estate is
encumbered by senior lienholders. (cf.
March 5, 1982 Transcript at pp 21–22).

In April, 1981 discussions occurred be-
tween Central Trust and Willson represent-
atives regarding Willson's deteriorating fi-
nancial condition. The company's March
31, 1981 financial statement and its 1980
financial audit both revealed continuing
and substantial operating losses. Based
upon the company's disappointing perform-
ance, Central Trust suggested that it be
liquidated or sold. Willson management
apparently accepted this suggestion, and
agreed to meet with bank officials to for-
mulate a plan towards that end. (Interve-
nor Exhibit 1). While the evidence does not
reveal whether a liquidation plan was ever
agreed upon, events which occurred during
May of 1981 indicate that such a plan must

---

1. Collateral for four of the loans consisted sole-
ly of certain motor vehicles owned by Willson.

See Exhibits AA, BB, CC, DD, and FF, attached
to the stipulations.

have been set in motion either unilaterally by the bank or by agreement of the parties.

On May 20, 1981 and May 21, 1981, Central Trust hand-delivered letters to Michael Grace demanding payment in full of Willson's outstanding indebtedness (Stipulations 23 & 24; Exhibits HH and II attached to Stipulations). On May 20, 1981, Central Trust issued a loan to Willson for $174,990.11 and another loan for $9507.82 on May 21, 1981. (Stipulations 23 & 24) The collateral used to secure these loans was the same as that which secured all of Central Trust's previous loans. No new security or other money or property was given by Willson for these loans.

According to the undisputed testimony of John L. Noelke, Assistant Vice-president of Central Trust, the purpose for issuing these loans was two-fold: First, to cover $19,000.00 in checks which Willson had already issued, and to cover checks which were to be issued in the future; and second, to enable Willson to keep its doors open while pursuing an orderly liquidation or sale of its business. (Transcript, March 5, 1982, pgs. 38, 56, 59, 64–65, 72–73; Transcript, November 19, 1982, pg 26.)

On May 21, 1981 Central Trust notified Willson of its default in payment and of the bank's intention to exercise its rights under its security agreements. (Exhibit II attached to Stipulations.) On the following day, Central Trust notified Willson and its two guarantors of its intention to sell most of Willson's saleable finished goods, equipment, raw materials and accounts receivable by private sale. Willson's guarantors were also informed that they would be held accountable for any deficiency in the amounts due which were not covered by the sale. (Exhibit JJ attached to Stipulations).

On May 22, 1981 H. Meyer Dairy Company agreed to purchase all of the above mentioned assets. (Exhibit KK attached to the Stipulations). Central Trust subsequently received a total of $678,648.06 in payment for such assets. (Exhibit OO attached to Stipulations). As of June 1, 1981 Willson's indebtedness to Central Trust amounted to $248,813.75. (Stipulation 30)

On April 21, 1982 some of Willson's remaining assets were sold at a court-approved public auction for $157,799.75. Some $25,457.99 of those proceeds are not subject to Central Trust's security agreements. (November 17, 1982 hearing, pg. 6). Excluding that unencumbered sum of money, the total amount of assets in the estate as of November 16, 1982 was $236,253.85. (Document 37, Adversary No. 1–81–0209). Thus, a deficiency of over $12,500.00 would remain if all of the encumbered assets of the estate as of the November, 1982 date were applied to Willson's prepetition indebtedness to Central Trust.

We turn now to the issues posed by the pleadings, evidence and arguments offered by the parties. Those issues were outlined by the Court at the November 17, 1982 hearing as follows:

1. Does equity exist for unsecured creditors as to any of the assets subject to Central Trust's security agreement?

2. Was the private sale of assets to H. Meyer Dairy valid?

3. By executing promissory notes subject to preexisting security agreements for loans received from Central Trust on May 20 and 21, 1981, did Willson make preferential and/or fraudulent transfers pursuant to 11 U.S.C. §§ 547 and 548?

4. Under the doctrine of marshaling of assets, should Central Trust be required to first look to Willson's guarantors for satisfaction of Willson's debts before proceeding against the assets of the debtor?

5. Is Central Trust entitled to postpetition interest on its secured claim under 11 U.S.C. § 506(b)?

The first two issues may be readily disposed of. Neither the trustee nor intervenors have questioned the validity of Central Trust's security agreements with Willson. Assuming that the May 20 and May 21 loans are not voidable under § 547 or § 548, it is apparent that no equity exists for unsecured creditors as to the property encumbered by Central Trust's security agreements.

While the trustee faintly raised some question about the validity of the sale to H. Meyer Dairy in his opening statement. (Transcript, March 5, 1982, p. 18) no evidence was presented to establish this proposition.

The trustee's voidable preference and fraudulent transfer claims must also be rejected. Essentially, the trustee supports these claims by pointing to the totality of the circumstances leading up to the May 20 and 21 transactions between Willson and Central Trust. He has failed, however, to meet his burden of presenting specific evidence which would establish the six elements of a preference under § 547. Indeed, he has not even established that a transfer from the debtor to the creditor occurred. It is well established that the mere issuance of a promissory note by a debtor does not constitute a transfer. *In re All-Brite Sign Service Co.,* 11 B.R. 409, 411 (Bkrtcy.W.D.Ky.1981); 4 *Collier on Bankruptcy* ¶ 547.15 at 547–50 (15th Ed.1979). While the perfection of a security interest within the 90 day period may constitute a transfer, (cf. *Cissell v. First National Bank of Cincinnati,* 476 F.Supp. 474, 492 (S.D. Ohio 1978) the *renewal* of a pre-existing security interest does not. As was noted in *First National Bank of Clinton v. Julian,* 383 F.2d 329, 334 (8th Cir.1967):

> ... [T]he giving of a new chattel mortgage in renewal of an old chattel mortgage, even though the mortgagor is insolvent at the time of the new chattel mortgage does not constitute a voidable preference.

*See also,* 4 *Collier on Bankruptcy,* ¶ 547.14 at 547–48, 547–49 (15th Ed.1979).

Regardless of how the May 20 and 21 transactions are characterized, the fact is that the bank received nothing more from those transactions than it already had. cf. *Kapala v. Newman,* 649 F.2d 887 (1st Cir. 1981). Thus, the logic of the holding in *Julian, supra,* applies with equal force here.

Having failed to establish this first branch of his burden of proof, we need not address the other elements of the trustee's burden under § 547, since all six must be established in order to prevail. *In re Kelley,* 3 B.R. 651, 6 B.C.D. 395 (Bkrtcy.E.D. Tenn.1980).

The trustee's fraudulent transfer claims are equally lacking in factual foundation. As was recently noted by Judge Burton Perlman in *In re Nance,* 26 B.R. 105 (Bkrtcy.S.D.Ohio, 1982), in order to recover under § 548(a)(1) the trustee must prove that the debtor made a transfer within one year of filing his petition with the actual intent to hinder, delay or defraud creditors. Alternatively, § 548(a)(2) requires a showing that the debtor made a transfer, (1) within one year before the date of the filing of the petition; (2) the debtor received less than a reasonably equivalent value in exchange for the transfer; and (3) that the debtor was insolvent on the date of the transfer.

As is true of other causes of action for fraud under the Bankruptcy Code, § 548(a)(1) requires a party to prove actual fraud by clear and convincing evidence. *See, e.g., In re Clemente,* 15 B.R. 937 (Bkrtcy.N.D..Ohio 1981). No evidence, let alone clear and convincing evidence, has been presented which would indicate that the May 20 and 21 transactions were motivated by fraud. Thus, no cause of action exists under § 548(a)(1).

The trustee's claims can fare no better under § 548(a)(2). As noted above, the only transfer which occurred on May 20 and 21 was the deposit of some $184,000.00 in the debtor's account. The extension of the bank's security interest to these loans cannot be considered a "transfer" under § 548 any more than it can be so considered under § 547. Furthermore, the trustee has presented absolutely no evidence that Willson received less than a reasonably equivalent value for the loans it received. To the contrary, the evidence suggests that if anyone suffered a loss from these transactions, it was Central Trust.

Finally, the trustee and intervenors contend that Central Trust should be required to seek satisfaction of Willson's debt from Willson's guarantors before turning to

Willson for payment. Their contention is based upon the equitable doctrine of marshaling of assets.[2] Since the doctrine involves the nature and effect of liens, claims and equities, we are guided by the law of Ohio in our determination of this issue. *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 436–439 (6th Cir.1982); *In re Easy Living,* 407 F.2d 142, 144 (6th Cir.1969); *Victor Gruen Associates, Inc., v. Glass,* 338 F.2d 826, 829 (9th Cir.1964). (Question of marshaling of assets governed by state law). Based upon our review of Ohio law, we conclude that the marshaling doctrine may not be applied in this case.

A restatement of Ohio law on marshaling of assets is succinctly set forth in *Homan v. Michles,* 118 Ohio App. 289, 290–291, 194 N.E.2d 162 (1963)

> ... [T]he doctrine of marshaling is a familiar one in equity, growing out of the equitable principle that a party having two funds to satisfy his demands shall not, by his election, disappoint a party who has only one of the funds upon which to rely, thus preventing him from exercising his right of recourse against the property or assets in question in an unreasonable manner or so as to satisfy his claim to the exclusion of such other claimants...
>
> In order that the doctrine may be applicable, the rule is that the parties must be creditors of the same debtor, and there can ordinarily be no marshaling of assets if the two funds to which creditors may resort are not derived from a common source or are not in the hands of a common debtor...
>
> The power to compel a party who has two funds to resort to the one on which others have no claim will only be exercised when it will work no injustice to any party

connected with the litigation. [citations omitted]

Citing *Mason v. Hull,* 55 Ohio St. 256, 45 N.E. 632 (1896), the *Homan* court specifically held that a junior creditor may not resort to the doctrine in order to require a senior lienholder to resort first to the property of the common debtor's surety. 118 Ohio App. at 292. This holding is in accord with virtually every court in the United States which has specifically addressed the issue. Annot., 135 A.L.R. 740. Its roots are at least as old as Justice Story's opinion in *Union Bank v. Laird,* 2 Wheat. 390, 4 L.Ed. 269 (1817). *See also, Swift & Co. v. Kortrecht,* 112 F. 709 (6th Cir.1902).

A fair reading of the marshaling doctrine provides ample justification for the rule set forth in *Homan.* The property of the surety is not in the common hands of the debtor as the doctrine requires. To require marshaling in these circumstances would not only be inequitable to the surety, but would also have a potentially prejudicial effect upon the surety's other creditors. cf. *In re Plad, Inc.* 24 B.R. 676 (Bkrtcy.M.D.Tenn. 1982). Furthermore, the surety has a right of subrogation to the position of the senior lienholder which, as *Homan* makes clear, is an equity superior to that of the debtor's other creditors.

If a junior lienholder may not require a senior lienholder to marshal assets as to a surety, it stands to reason that he may not do so as to a guarantor. The parameters of the two undertakings make this apparent. As was noted in *Galloway v. Bainesville Loan, Inc.,* 74 Ohio App. 23, 27, 57 N.E.2d 337 (1943):

> There is a distinction recognized between a surety and guarantor. While each are obliged to pay the obligation of another, a

**2.** During his opening statement at the March 5, 1982 hearing, the attorney for the trustee vaguely alluded to the doctrines of contribution and equitable subordination as alternative theories of recovery. Neither of these theories was subsequently addressed in the parties' briefs, and we find neither to be applicable to this proceeding. Contribution may not be invoked, since neither the trustee nor intervenors are in the position of joint obligors who have paid a

disproportionate share of a common debt. Cf. *In re Westerhoff,* 688 F.2d 62 (8th Cir.1982); *Baltimore & Ohio R.Co. v. Walker,* 45 Ohio St. 577, 16 N.E. 475 (1888). Equitable subordination is usually invoked to reorder the priority of distribution, and requires a showing that a debtor's fiduciary engaged in inequitable conduct towards the debtor. *In re Westgate-California Corp.* 642 F.2d 1174 (9th Cir.1981). No such showing was made in this case.

surety joins in the same promise as his principle and is primarily liable, while the guarantor makes a separate and individual promise and is only secondarily liable, his liability being contingent on the default of his principal and he becomes absolutely liable when such default takes place and when notified thereof.

Since a guarantor is only secondarily liable for the debtor's obligation, the equitable considerations which preclude the application of the marshaling doctrine to a surety apply with even greater force to a guarantor.

The very nature of a guarantor's obligations undercuts the trustee's and intervenors' claim that Grace and Green Valley Stores made a contribution to Willson's capital assets. Furthermore, nothing in the record indicates that the property of the debtor and the property of the guarantors were ever considered or treated as one and the same. The only conclusion which the evidence permits is that Grace and Green Valley Stores were intended to be secondarily liable for Willson's debts, and not contributors to Willson's capital.

Based upon the above, we conclude that the marshaling doctrine may not be invoked to require Central Trust to first look to Willson's guarantors for satisfaction of Willson's debts before proceeding against the debtor's assets.

■ The last issue remaining for decision is whether Central Trust is entitled to post-petition interest on its secured claim from June 1, 1981 pursuant to 11 U.S.C. § 506(b). That provision states that the holder of a secured claim is entitled to interest on such claim only to the extent that the value of the collateral exceeds the amount of the claim. Central Trust has asserted and established that the proceeds from the sale of the debtor's assets which were encumbered by Central Trust's security agreements are less than its claim. Since Central Trust is undersecured, its claim for post-petition interest is denied. *In re Anderson,* 6 B.R. 601, 6 B.C.D. 1155, 1158–59 (Bkrtcy.S.D. Ohio 1980).

For all of the reasons stated above, the trustee's complaint and counterclaim are hereby DISMISSED. The relief sought by Central Trust in its complaint for reclamation is GRANTED, with the exception of its claim for post-petition interest.

The foregoing shall constitute the Court's findings of fact, opinion and conclusions of law.

IT IS SO ORDERED.